**REVISED**

**UNITED STATES COURT OF APPEALS**
**for the Fifth Circuit**
_____

No. 95-31135
_____


UNITED STATES OF AMERICA,

      Plaintiff-Appellee - Cross-Appellant,

    VERSUS


STEVEN B. TENCER,

      Defendant-Appellant - Cross-Appellee,

    AND


RONALD LAZAR,

      Defendant-Appellant - Cross-Appellee.

_____

Appeals from the United States District Court
for the Eastern District of Louisiana
_____

March 10, 1997

Before WISDOM, DAVIS, and DUHÉ, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Steven Tencer and Ronald Lazar challenge their convictions on multiple counts related to their scheme to submit fraudulent claims to insurance companies and obtain proceeds for unperformed chiropractic services. The government cross-appeals a number of the district court's rulings. For reasons that follow, we affirm in part, reverse in part, and remand this case to the district court for sentencing.

I.

Appellants Tencer and Lazar, both licensed chiropractors, worked at the Allied Chiropractic Clinic ("Allied") in Kenner, Louisiana. Tencer, who owned the clinic, turned over the bulk of his practice to Lazar, his employee, in 1989; thereafter, Tencer generally supervised the clinic's financial affairs while Lazar treated patients on a day-to-day basis. From sometime in 1988 to early 1992, Allied submitted false insurance claims to three insurance companies, Blue Cross/Blue Shield of Louisiana ("Blue Cross"), Mail Handlers Benefit Plan ("Mail Handlers"), and National Association of Letter Carriers ("NALC"), and collected proceeds for patients who were not treated at all or who received only minimal treatment.

To execute the fraud, the appellants paid insurance premiums for some patients who, in return, signed multiple sign-in sheets indicating their presence in the office awaiting treatment. Those sheets were then used to generate false insurance claims. Appellants followed a similar pattern with patients recruited from local and federal government agencies; patients with good insurance benefits for chiropractic services were paid to sign their names and the names of family members on the clinic's sign-in sheets. They were also compensated for referring coworkers to Allied.

While Allied apparently provided some legitimate services, many patients testified that they and their family members received either no treatment or only cursory treatment consisting of brief massages or the application of heat pads. Yet, the claim forms

Allied submitted for these same patients reported complicated diagnoses and elaborate treatment regimens. As a result of the scheme, Allied submitted hundreds of fraudulent claims and collected more than $450,000 in insurance proceeds related to these patients.

Before trial, Tencer moved unsuccessfully to sever his trial from Lazar. Following the jury trial, Tencer was convicted of one count of conspiracy to commit mail fraud and money laundering in violation of 18 U.S.C. § 371 (count 1); seventeen counts of mail fraud in violation of 18 U.S.C. § 1341 (counts 2-18); and eighteen counts of money laundering in violation of 18 U.S.C. § 1956 (counts 19-29, 31-37). The jury also returned a special forfeiture verdict of $1,598,645.18 and two vehicles allegedly involved in the money laundering. The district court acquitted Tencer on five money laundering counts (counts 26-29, 37) and reduced the jury's forfeiture order to $700,000. Tencer was sentenced to 78 months' imprisonment, fined $17,500, and ordered to pay restitution of $451,969.60 and to forfeit $700,000.

Lazar was convicted of conspiracy, mail fraud, and money laundering (counts 1-18, 37), but the court acquitted him on the money laundering count (count 37). He was sentenced to 33 months' imprisonment and fined $30,000. Tencer and Lazar raise a number of issues on appeal, which we discuss below. We also consider below several issues the government raises in its cross-appeal.

## II.

Both Tencer and Lazar argue that the evidence is insufficient

3

to support their convictions for mail fraud, money laundering, and conspiracy. Faced with such a challenge, this court must determine "`whether, after viewing the evidence and all inferences that may reasonably be drawn from it in the light most favorable to the prosecution, any reasonably minded jury could have found that the defendant was guilty beyond a reasonable doubt.'" United States v. Krenning, 93 F.3d 1257, 1262 (5th Cir. 1996) (quoting United States v. Leahy, 82 F.3d 624, 633 (5th Cir. 1996)).

## A.

To establish a mail fraud violation under 18 U.S.C. § 1341, the government must demonstrate (1) a scheme to defraud; (2) the use of mails to execute that scheme; and (3) the defendant's specific intent to commit fraud. United States v. Fagan, 821 F.2d 1002, 1008 (5th Cir. 1987), *cert. denied*, 484 U.S. 1005 (1988). Counts 2-18 charged appellants with using the mails in furtherance of a scheme to defraud Blue Cross, Mail Handlers, and NALC. Counts 2-10 stem from nine separate mailings of checks from Blue Cross to Allied. Counts 11-18 involve checks mailed from Mail Handlers and NALC. The individual check that government relies in for the "mailing" on each of the mail fraud counts is identified in the indictment and was introduced in evidence at trial.

## 1.

Appellants first argue that the evidence fails to establish the mailing requirement as it relates to the Blue Cross checks underlying counts 2-10. To convict a defendant under § 1341, the use of the mails must be "'incident to an essential part of the

4

scheme.'" <u>Schmuck v. United States</u>, 489 U.S. 705, 711 (1989) (quoting <u>Pereira v. United States</u>, 347 U.S. 1, 8 (1954)).  That is, completion of the alleged scheme must depend in some way on the information or documents that passed through the mail.  <u>United States v. Pazos</u>, 24 F.3d 660, 665 (5th Cir. 1994).  Even a routine or innocent mailing may supply the mailing element as long as it contributes to the execution of the scheme.  <u>Schmuck</u>, 489 U.S. at 714-15.

Ample evidence supports the existence of a scheme to defraud Blue Cross, Mail Handlers, and NALC, and appellants' use of mails to execute that scheme.  Several patients testified that they never received treatments for which their insurers were billed, and insurance representatives testified that payments for all claims were mailed to Allied.  The evidence regarding Blue Cross in particular showed that Allied billed the insurer for 2,944 visits with patients about whom testimony was offered; Allied received approximately $362,000 from Blue Cross in payment for the visits. The Blue Cross-insured patients testified that they received little or no chiropractic care in return for the money Blue Cross paid Allied.

As to each of the counts at issue here (counts 2-10), the indictment alleges that Blue Cross mailed a specific check to pay fraudulent claims.  The government, however, failed to produce any evidence tending to connect these individual checks with fraudulent claims.  The record does not reveal the name of the patient, the date of the treatment, or other relevant information demonstrating

what claims the individual checks paid. As the government acknowledged, Allied submitted some valid claims for legitimate treatment. Consequently, the government's evidence is insufficient to establish that the checks relied on in counts 2-10 were in payment of fraudulent claims and therefore were used to execute the scheme to defraud.

The government argues that a review of claim forms, the checks, and patient testimony supports the inference necessary for convictions on these counts. According to the government, given the regularity with which patients signed in and claims were submitted and paid, the checks described in counts 2-10 must contain fraudulent payments. We disagree. The government submitted no evidence to indicate how quickly Blue Cross responded to claims or to illustrate the number or amount of legitimate claims Allied submitted to Blue Cross. Therefore, any conclusion that the nine individual checks were in payment for fraudulent claims is speculative.

Alternatively, the government asserts that proof that each check contained fraudulent proceeds is not necessary to sustain mail fraud convictions. Simply put, the government argues that because the evidence of both a scheme to defraud and the use of mails is overwhelming, this court should overlook its failure to identify specific checks containing fraudulent proceeds.

The government relies on United States v. Reid, 533 F.2d 1255 (D.C. Cir. 1976), in which the defendant, a credit director, submitted for payment inflated bills to a collection agency. The

6

defendant argued that the evidence was insufficient to support his mail fraud convictions because it did not demonstrate that the invoices or checks on which the mail fraud counts were based were inflated billings or payments.  Id. at 1263.  The court disagreed, stating:

> As a matter of practicality, in most schemes to defraud, it would be very difficult for the prosecution to show that any particular check or invoice was in itself false or inflated in amount, because in a course of dealing over a period of months the bills sent and the payments made are not necessarily tied in with ascertainable and accurate accounting data.  In fact, it may be assumed that persons engaged in such a scheme to defraud would take some pains not to tie in the invoices and checks with other records which would be in the hands of the person or company being defrauded, in order to escape detection.

Id.

However, Reid's reasoning is not applicable here.  The D.C. Circuit in Reid emphasized that because of the nature of the fraudulent scheme, determining what invoices or checks were fraudulent would be nearly impossible.  In contrast, the government here makes no contention that the nature of the fraud made it difficult for it to demonstrate what checks contained fraudulent proceeds; it argues instead that such a link is unnecessary to support a conviction.  We disagree, and we decline to endorse a broad reading of § 1341's mailing requirement that would relieve the government of the burden of proving that mailings underlying mail fraud counts are related to the fraud being perpetrated.[1]

---

[1]The government also asserts that because the continuing payment of all Blue Cross claims--both legitimate and illegitimate--was integral to the success of appellants' scheme, it is unnecessary to establish what checks contained fraudulent proceeds.

7

In sum, we can identify no record evidence demonstrating that the checks underlying counts 2-10 contained fraudulent proceeds. Without such evidence, a rational trier of fact could not have found Tencer and Lazar guilty beyond a reasonable doubt of the offenses charged in those counts. Because the government's evidence as to counts 2-10 was legally insufficient to establish guilt beyond a reasonable doubt, the convictions of Tencer and Lazar on those counts must be reversed.

2.

Counts 11-18 charge mail fraud based on checks mailed to Allied from Mail Handlers and NALC.[2] Tencer argues that because the Allied patients insured by NALC or Mail Handlers testified that they had no direct dealings with him, the evidence is insufficient to establish the specific intent to defraud required by 18 U.S.C. § 1341 as to these counts. Tencer misconstrues the intent requirement. The government need not demonstrate that Tencer was aware that these particular patients were scheme participants; rather, the intent element is satisfied as long as the government showed that Tencer willfully participated in a scheme to defraud "with the intent that the scheme's illicit objectives be achieved." United States v. Rochester, 898 F.2d 971, 977 (5th Cir. 1990); *see*

---

We acknowledge that "innocent" mailings can sometimes support mail fraud convictions. Schmuck, 489 U.S. at 714-15. However, the government has failed to offer any explanation as to how the payment of legitimate claims furthered the scheme to defraud.

[2]Because each of these checks identified the claims being paid, we are not faced with the gap in the evidence just discussed in connection with the Blue Cross checks.

8

*also* <u>United States v. Jimenez</u>, 77 F.3d 95, 97 (5th Cir. 1996). That is, the government must show Tencer participated in the scheme to defraud, not that he took part in every aspect of that scheme. Indeed, given Tencer's admittedly supervisory role in the clinic, evidence of direct patient contact on his part would be unlikely.

The government presented overwhelming evidence of Tencer's participation in a scheme to defraud insurance companies. Allied employees testified that Tencer reviewed claim forms and, at times, tacked on charges to inflate billings, regardless of whether additional services had been provided. Patients testified that Tencer regularly paid for their insurance in return for their signature on sign-in sheets and that he instructed them to lie about their health to insurance representatives to enable them to obtain insurance more easily. This evidence is sufficient for a rational trier of fact to find that Tencer had the requisite intent to defraud.

Both Tencer and Lazar argue that the government failed to submit evidence of fraud as to three of the counts (counts 13, 15-16). Count 13 involved a payment from Mail Handlers for a claim by Darryl Smith, and counts 15 and 16 involved claims for Smith's then three-year-old daughter, Madeline. Neither of these patients testified at trial. However, Jerry Kelley, a coworker of Darryl Smith, testified that Smith referred Kelley to Allied and that Smith told him he would be paid for his visits. Shortly thereafter, Smith and Kelley visited Allied together, and Smith gave Kelley money for the visit. In light of Kelley's testimony

that he was recruited into the scheme by Smith and later paid by Smith for his participation in insurance fraud, the jury could infer that Smith was intimately involved in the fraud himself and that the claims submitted on behalf of Smith were fraudulent.

Counts 15 and 16 were based on checks paying claims for treatment to Madeline Smith. During a five-month period, Allied billed Madeline's insurer for 49 visits for a total of $6,735.50. Appellants offered no explanation for the excessive number of visits by a three-year-old child. In addition, Kelley and other patients testified that the appellants encouraged them to bring their children into the clinic and to sign their names, regardless of whether they needed or received treatment.

This circumstantial evidence, viewed in the light most favorable to the government, is sufficient to support appellants' convictions on counts 13, 15, and 16.

Finally, Lazar argues that the government failed to establish that mailings underlying five counts (counts 11-12, 14, 17-18) were used to execute the fraud. Specifically, he contends that no evidence shows that the checks from NALC and Mail Handlers were for fraudulent claims. We disagree.

The checks at issue were in payment for claims by Rashad Sanders, Jerry Kelley, Kelley's four-year-old son, Jerry Kelley Jr., Barbara Blanchard, and Blanchard's son, Matthew Blanchard. The government presented testimony by Sander's mother, Ernestine Gray, Kelley Sr., and Barbara Blanchard. Each testified that they were paid to visit the clinic, to refer coworkers and family

10

members, and to pre-sign Allied's sign-in sheets. For example, the elder Kelley testified that, beginning in March 1992, he visited the clinic two to three times a week and signed in his own name and the names of his wife and son. Although Kelley brought his son to the clinic only twice, Allied billed Mail Handlers for 44 visits for the younger Kelley over a three-month period.

Similarly, although Gray visited the clinic only four times in all, Allied submitted 38 claims for her and 35 claims for her son, Rashad. On two occasions, Lazar even brought sign-in sheets to Gray's home for her to sign. Lastly, Barbara Blanchard testified that she and her two children visited Allied about five times during spring 1992. Allied billed NALC for 22 visits for Barbara Blanchard and for 24 visits for her son, Matthew.

Viewing the evidence in the light most favorable to the government, a reasonable jury could conclude beyond a reasonable doubt that the checks underlying counts 11, 12, 14, 17, and 18 were mailed as a result of Allied's fraudulent billing and, therefore, that mails were used to execute the appellants' fraud.

B.

Tencer next challenges the sufficiency of the evidence supporting his conviction for money laundering on six counts (counts 31-36), and the government, on its cross-appeal, challenges the district court's acquittal of both Tencer and Lazar on one of the money laundering counts (count 37). To support a conviction under 18 U.S.C. § 1956, the money laundering statute, the government must prove that the defendant 1) conducted or attempted

11

to conduct a financial transaction, 2) which the defendant knew involved the proceeds of a specified unlawful activity, 3) with the intent to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity. United States v. West, 22 F.3d 586, 590-91 (5th Cir. 1994), *cert. denied*, 115 S. Ct. 584 (1994); 18 U.S.C. § 1956(a)(1)(B)(i).

## 1.

Tencer contends first that the government failed to produce sufficient evidence to establish the concealment element of six of the money laundering counts (counts 31-36). Those counts stemmed from six transfers of funds by wire and check from various money market accounts throughout the country into one account in Tencer's name at California Federal Bank in Las Vegas, Nevada. A brief description of the facts is necessary to understand Tencer's argument.

Between May 1989 and April 1992, Tencer opened bank accounts in various banks across the country and deposited checks drawn on his personal account at Fidelity Homestead and on the Allied Clinic account at Whitney National Bank. On July 9, 1992, a little more than a week after federal agents had executed a search warrant at Allied Clinic, Tencer faxed instructions to several of the regional banks where he had accounts. He directed those banks to transmit his funds on deposit by mailing cashiers checks by Federal Express to an Algiers, Louisiana, address at which Tencer neither worked nor resided. On July 13, 1992, Tencer opened an account at California Federal Bank in Las Vegas, Nevada, using some of the

12

cashiers checks; his initial deposit totaled $662,637.06. He told employees at the Las Vegas bank that he was moving into the area and needed cash to buy a business. He also directed banks that had not yet mailed cashiers checks to the Algiers address to wire funds totaling $312,297.89 to the account at California Federal Bank. The next day, Tencer deposited an $89,832.10 cashiers check into the account and withdrew $9,900.[3] Later that day, Tencer arranged to have the entire balance in the account--roughly $1,055,000-- delivered to him in cash at a local airport. Before the funds could be picked up by a security company and delivered to Tencer, a seizure warrant was executed on the California Federal account.

Tencer argues that the government has presented no evidence that he sought to conceal the nature, source, ownership, or control of the funds. He contends that when he opened the regional accounts initially and later transferred those balances to the California Federal account, he used his own name and handled his own transactions. No third parties were used, and a paper trail clearly connected Tencer to both the regional and California Federal accounts.

The government counters that the use of a false identity is not essential to a money laundering conviction. It contends that Tencer's request that funds be sent to an address at which he neither worked nor resided, his use of a Las Vegas bank hundreds of

---

[3]Withdrawals of more than $10,000 in cash require the completion of a Currency Transaction Report; according to a bank official, withdrawals slightly below the regulated amount are not unusual.

13

miles away from his home and business to consolidate funds, and his false statements to bank employees about his plans to move to the area demonstrated his intent to conceal.

We reject as overly narrow Tencer's view that § 1956's concealment element is satisfied only by an attempt to disguise the defendant's identity. Several circuits, including this one, have recognized that the government need not "prove with regard to any single transaction that the defendant removed all trace of his involvement with the money or that the particular transaction charged is itself highly unusual." United States v. Willey, 57 F.3d 1374, 1386 (5th Cir.), *cert. denied*, 116 S. Ct. 675 (1995); *see, e.g.*, United States v. Kinzler, 55 F.3d 70, 73 (2d Cir. 1995) ("§ 1956(a)(1)(B)(i) does not require an attempt to conceal the identity of the defendant; a scheme that conceals only the source of the funds falls within the purview of the statute."); United States v. Manarite, 44 F.3d 1407, 1416 (9th Cir.) (holding that defendants, by cashing gambling chips in small quantities and at different times and places, showed intent to conceal even though they made no intent to disguise their identities), *cert. denied*, 115 S. Ct. 2610 (1995); United States v. Campbell, 977 F.2d 854, 857-58 (4th Cir. 1992) (upholding conviction where evidence of concealment consisted of real estate agent's suspicion that client's funds were derived from illegal activity coupled with under-the-table cash transfer of $60,000 cash down payment on home), *cert. denied*, 507 U.S. 938 (1993); United States v. Lovett, 964 F.2d 1029, 1034 n.3 (10th Cir.) ("To find that the money

14

laundering statute is aimed solely at those transactions designed to conceal the identity of the participants to the transaction is to ignore the broad language of the statute."), *cert. denied*, 506 U.S. 857 (1992). Thus, the fact that Tencer did not seek to conceal his identity while depositing funds in the California Federal account does not require us to reverse his conviction on these counts.

Tencer argues that this court's decision in United States v. Dobbs, 63 F.3d 391 (5th Cir. 1995), supports reversal. In Dobbs, the defendant deposited proceeds of bank fraud into his wife's bank account, converted other proceeds into cashiers checks, and then used the account and checks for family and business expenses. This Court found insufficient evidence to sustain the defendant's money laundering convictions because the transactions were "open and notorious" and no third parties were used to make purchases or hide his activity. Id. at 397; *see also* Willey, 57 F.3d at 1388 (reversing conviction where only evidence of concealment was transfer of money from one account to another).

In Dobbs, unlike today's case, the government produced no evidence that the transactions were conducted to disguise the relationship between the defendant and the fraudulent proceeds. Dobbs, 63 F.3d at 398. Whereas Dobbs openly used fraudulently obtained funds to pay for business and family expenses, Tencer endeavored to consolidate illicit funds in a city that was hundreds of miles from his home and where large cash transactions are commonplace. He asked regional banks to wire funds to an address

to which he had no connection. His false statements to bank officials showed an intent to minimize attention to the transactions. Based on the evidence in the record, a jury could infer that Tencer was attempting to conceal the nature of the funds and facilitate laundering of the proceeds of his fraudulent activities.

Tencer argues next that if his conviction on mail fraud counts 2-10 are reversed, the money laundering convictions must be reversed as well because the government failed to prove "specified unlawful activity." A review of the money laundering statute and relevant case law persuades us that Tencer's conviction under § 1956 will stand; the government has demonstrated that the funds involved are proceeds of a "specified unlawful activity" as statutorily defined.

Section 1956 requires that the financial transaction "*in fact* involve[d] the proceeds of *specified unlawful activity*." 18 U.S.C. § 1956(a)(1) (emphasis added). "Specified unlawful activity," by statute, includes any racketeering offense listed in 18 U.S.C. § 1961(1). 18 U.S.C. § 1956(c)(7)(A). In turn, mail fraud, as set forth in § 1341, is one of the offenses listed in § 1961(1).

Tencer argues that the government did not establish that any Blue Cross mailings occurred in furtherance of the scheme to defraud. We disagree. In reversing the appellants' convictions on counts 2-10, we concluded that the government established at trial both the existence of a scheme to defraud Blue Cross and appellants' use of mails to execute that scheme. Patients insured

16

by Blue Cross testified that they never received treatments for which Blue Cross was billed, and a Blue Cross representative testified that payments for all claims were mailed to Allied. More particularly, the government produced evidence that Allied submitted roughly $362,000 in claims to Blue Cross that were related to patients about whom testimony was given. Those patients testified that they received no treatment in connection with a majority of the claims submitted on their behalf. Blue Cross then transmitted checks in payment of those claims through the mail to Allied. We are unable to affirm the mail fraud convictions as to counts 2-10 because the evidence is insufficient to show that the specific Blue Cross checks alleged in the indictment--the mailings on which those counts are based--were in payment of fraudulent claims and therefore used to execute the insurance fraud. However, our reversal as to those counts does not disturb our conclusion that the evidence demonstrated that Allied received more than $300,000 through the mail from Blue Cross in payment of fraudulent claims. This adequately established mail fraud for purposes of the money laundering counts.

Tencer contends that this court and others have reversed money laundering convictions where convictions as to the predicate unlawful activity have been reversed. *See* United States v. O'Hagan, 92 F.3d 612, 628 (8th Cir. 1996), *cert. granted on other grounds*, 117 S. Ct. 759 (1997); United States v. Brumley, 79 F.3d 1430, 1442 (5th Cir.), *reh'g en banc granted*, 91 F.3d 676 (5th Cir. 1996). In O'Hagan, the court first vacated securities fraud counts

17

and then vacated mail fraud counts premised in the indictment on acts that allegedly constituted securities fraud. O'Hagan, 92 F.3d at 627. Because the court vacated all of the securities fraud and mail fraud counts, it found no unlawful activity on which to base money laundering convictions. Id. at 928. Similarly, in Brumley, this court vacated a defendant's money laundering convictions where the counts in the indictment identified the "specified unlawful activity" by cross-referencing wire fraud counts that had been vacated. Brumley, 79 F.3d at 1442.

In Tencer's case, the relevant money laundering counts in the indictment (counts 31-36) identified the funds at issue as "proceeds of specified unlawful activity, that is, the knowing and intentional commission of mail fraud" under 18 U.S.C. § 1341. These counts then incorporated by reference paragraphs in the indictment describing the nature of the scheme to defraud. However, neither the paragraphs incorporated by reference nor the language in counts 31-36 define the predicate unlawful activity as the mail fraud charged in counts 2-18. Because the money laundering counts do not define "specified unlawful activity" in terms of the mail fraud activities described in counts 2-18, this court is not limited to considering only those activities. *Cf.* United States v. Smith, 44 F.3d 1259, 1264-65 (4th Cir.) (holding that indictment describing funds involved in transaction generally as wire fraud proceeds was sufficient to define specified unlawful activity at issue), *cert. denied*, 115 S. Ct. 1970 (1995).

Thus, Tencer's convictions on counts 31-36 will stand as long

18

as the jury, viewing the evidence in the light most favorable to the government, could infer that the six deposits by wire and cash into the California Federal account "involved" mail fraud proceeds for purposes of § 1956(a)(1).  To do so, the government need not prove that all of the money involved in the transfers were proceeds of mail fraud; it is sufficient if the government proves at least part of the money represented such proceeds.  *See, e.g.*, United States v. English, 92 F.3d 909, 916 (9th Cir. 1996); United States v. Cancelliere, 69 F.3d 1116, 1120 (11th Cir. 1995); United States v. Jackson, 935 F.2d 832, 840 (7th Cir. 1991); *cf.* United States v. Moore, 27 F.3d 969, 976 (4th Cir.), *cert. denied*, 115 S. Ct. 459 (1994).

As noted above, the government presented evidence that from May 1989 to April 1992, Tencer opened accounts in various banks across the country and deposited checks drawn on his personal account at Fidelity and on Allied's account at Whitney National Bank.  Marcus Veazey, an FBI agent, testified that the majority of deposits into the Whitney account were from insurance companies and that the specific checks in evidence were deposited into that account as well.  From July 1989 through July 1992, $2,681,205.60 in insurance proceeds were deposited into the account.  Agent Veazey testified that nearly $452,000 was related to patients who, according to patient testimony, participated in the insurance fraud; of that amount, roughly $362,000 came from Blue Cross checks.

Veazey then testified as to the movement of funds from the

19

Whitney account. Checks written on that account went to Allied's operating account at Fidelity Homestead, Tencer's personal account at Fidelity, and to several regional accounts. From July 1989 to summer 1992, $756,066.20 from the Whitney account was deposited into Tencer's personal account at Fidelity. Veazey testified that during this time period, Tencer deposited checks drawn on his personal account into regional accounts as well. According to a chart introduced by the FBI agent, Tencer deposited nearly $1.4 million in regional accounts during the three-year period. On July 13, 1992, he opened an account at California Federal and deposited $662,637.06 in checks drawn on five of those accounts. He also directed four banks to wire funds totaling $312,297.89 to the account. On July 14, Tencer deposited $89,832.10 in a check drawn on one regional account. By establishing that fraudulent proceeds were initially deposited into the Whitney account and that Tencer later transferred funds from that account into regional accounts and, then, into the California Federal account, the government has adequately established that the six transfers at issue "involved" unlawful proceeds.

In sum, while the government has not demonstrated what specific Blue Cross checks included fraudulent proceeds, it did establish that Blue Cross paid Allied approximately $362,000 that was directly related to patients who testified that Allied submitted claims to Blue Cross on their behalf even though they received little or no treatment. The government then established that the checks making up the $362,000 were deposited in the

20

Whitney account. Funds from the Whitney account were later deposited in Tencer's personal account, his regional accounts, and, finally, in the California Federal account.

Given this evidence and the volume and scope of the insurance fraud, the jury was entitled to infer that most of the $362,000 was in payment for fraudulent claims. Furthermore, the jury could infer that the six transactions underlying counts 31-36 involved proceeds from this unlawful activity--specifically, mail fraud.

2.

The government cross-appeals the district court's acquittal of both Tencer and Lazar on one of the money laundering counts (count 37). That count charged a violation of 18 U.S.C. § 1956 in connection with Lazar's August 10, 1992 deposit of approximately $60,000 in insurance checks into an Allied Clinic account with Dean Witter Reynolds. Lazar made the deposit at Dean Witter's New Orleans office on the same day Tencer opened the account in a Dean Witter office in southern California. Lazar directed the New Orleans branch to credit his deposit to the Allied account Tencer opened with Dean Witter in California. Some of the more than $60,000 in insurance checks Lazar deposited were in payment for claims for patients who had not received the reported treatment.

As discussed above, to support a money laundering conviction, the government must show that the defendant acted with an intent to conceal. In support of the concealment element, the government has shown only that a deposit was made with a national brokerage firm in New Orleans to be credited to an existing account with the same

firm in California.  We agree with the district court that although a geographically distant financial transaction is a factor that can be considered in support of the concealment element, it does not alone establish intent to conceal.

We recognize that the timing of this transaction is suspicious: the deposit was made shortly after the government seized Tencer's funds in the Las Vegas account.  But the government provided no evidence that the transfer of the funds from New Orleans to the existing California Dean Witter account made the account harder to find or that a depositor would believe such a transfer would tend to conceal the funds.  The district court correctly acquitted both Tencer and Lazar on this count.

C.

Finally, Tencer contends that the evidence is insufficient to support his conviction for conspiracy.  To establish conspiracy under 18 U.S.C. § 371, the government must establish "(1) an agreement between two or more persons, (2) to commit a crime against the United States, and (3) an overt act in furtherance of the agreement committed by one of the conspirators."  Krenning, 93 F.3d at 1262.  Conspiracy may be proved through circumstantial evidence, and the agreement need not be formal or spoken.  Id. at 1264.  Here, abundant evidence presented at trial in support of the mail fraud and money laundering counts set forth above demonstrated the active participation of both appellants in the scheme to defraud and their cooperative efforts in ensuring its success. This circumstantial evidence of agreement, together with evidence

22

of the appellants' active participation in the scheme, is sufficient to support appellants' convictions for conspiracy.

III.    Tencer argues next that the district court's denial of his severance motion prevented him from introducing exculpatory testimony by Lazar, who would testify only in a separate trial.  To support his motion, Tencer submitted Lazar's affidavits, which stated that, to his knowledge, Tencer did not commit any of the acts underlying the charged offenses.

This court has recognized that, as a general rule, persons indicted together should be tried together, especially in a conspiracy case, United States v. Neal, 27 F.3d 1035, 1045 (5th Cir.), *cert. denied*, 115 S. Ct. 530 (1994), and that "'a district court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt.'"  Id. (quoting Zafiro v. United States, 506 U.S. 534, 537 (1993)).  To obtain a severance based on a codefendant's exculpatory testimony, a defendant must initially demonstrate (1) a bona fide need for the testimony; (2) the testimony's substance; (3) its exculpatory nature and effect; and (4) the willingness of the codefendant to testify.  United States v. Ramirez, 979 F.2d 1024, 1035 (5th Cir. 1992), *cert. denied*, 508 U.S. 913 (1993).  Upon such a showing, a court must consider, among other things, the significance of the testimony in relation to the defendant's theory of defense and the extent of prejudice caused by the absence of such testimony.  Id.  This court reviews the denial of a motion to

23

sever for abuse of discretion.  United States v. Dillman, 15 F.3d 384, 393 (5th Cir.), *cert. denied*, 115 S. Ct. 183 (1994).

The government contends that Tencer failed to meet his initial burden because he did not establish the exculpatory nature of Lazar's proposed testimony.  Lazar's affidavits assert generally that Tencer did not conspire with Lazar to defraud insurance carriers and, more specifically, that he was not aware that Tencer approved billing for unnecessary treatments, paid patients to sign names of friends and family on sign-in sheets, or offered to pay patients' health-insurance premiums in order to submit false claims.  Lazar further stated that he, not Tencer, initiated the clinic practice of paying new patients a "referral fee" and paying for patients' transportation costs.  We agree with the government that Lazar's proposed testimony as to Tencer's lack of knowledge of the scheme to defraud consists of conclusory allegations and contains no specific facts that would exonerate him.  United States v. Broussard, 80 F.3d 1025, 1037-38 (5th Cir.), *cert. denied*, 117 S. Ct. 264 (1996); *see also* United States v. DeSimone, 660 F.2d 532, 540 (5th Cir. 1981) (upholding denial of severance where affidavit "amount[ed] to little more than a bare, conclusory assertion that he did not conspire with his co-defendants, nor they with him"), *cert. denied*, 456 U.S. 928 (1982).  Tencer argues that he did not know of fraudulent billing practices underlying the offenses charged and that Lazar's testimony would have cleared him of any involvement.  However, even if the jury had heard and accepted Lazar's testimony that, to Lazar's knowledge, Tencer knew

24

nothing of billing errors and falsified sign-in sheets, such testimony would have had little evidentiary value in light of the abundant evidence of Tencer's role in generating fraudulent claim forms and paying for patients' insurance. *See* <u>United States v. Jobe</u>, 101 F.3d 1046, 1060 (5th Cir. 1996). Moreover, Lazar's affidavits admit to no mail fraud or money laundering activities. A codefendant's proposed testimony lacks credibility when it does not contravene his own penal interests. *See* <u>DeSimone</u>, 660 F.2d at 540; <u>Dillman</u>, 15 F.3d at 394. While Lazar acknowledged that he paid referral fees and transportation costs to patients, he denies knowledge of the fraudulent billing from which the mail fraud counts arose.

In sum, Lazar's affidavits failed to set forth specific exonerative facts from which the district court could have concluded that his testimony would have had an exculpatory effect, and Tencer has not demonstrated that he suffered specific and compelling prejudice by the denial of his severance motion. Accordingly, the district court did not abuse its discretion in denying Tencer's motion to sever.

IV.

Both Tencer and the government challenge the district court's forfeiture order. The jury returned a special forfeiture verdict of $1,598,645.18 and two vehicles allegedly involved in all of the money laundering counts. Because the court vacated counts 26-29 and count 37, it similarly vacated the forfeiture verdict related

25

to those counts.[4]  Of the remaining money laundering counts (counts 31-36), a verdict of $1,055,395.71--representing the balance on deposit in the California Federal account--was returned.  The district court reduced the forfeiture to $700,000.  Tencer argues that the forfeiture order must be reversed in its entirety because it includes proceeds from legitimate insurance claims.  The government responds that reversal is inappropriate and that, instead, the jury verdict ordering forfeiture of the California bank account should be reinstated.

Forfeiture in this case was imposed pursuant to 18 U.S.C. § 982(a)(1), a mandatory criminal forfeiture provision stating:

> The court, in imposing sentence on a person convicted of an offense in violation of . . . Section 1956 . . . of this title, shall order that the person forfeit to the United States any property, real or personal, *involved in such offense*, or any property traceable to such property.

18 U.S.C. § 982(a)(1) (emphasis added).  The government argues that all of the funds in the California Federal account were forfeitable because any legitimate funds involved and "facilitated" the offense by providing a cover for the tainted funds.  This "facilitation theory" rests largely on a passage in the legislative history of § 981,[5] § 982's civil counterpart: "[T]he term 'property involved' is intended to include the money or other property being laundered

---

[4]The government does not challenge this action.

[5]Section 981, like § 982, uses the phrases "involved in" and "traceable to."  Relatively few cases have interpreted § 982; those that have often rely on § 981 case law. *See, e.g.*, United States v. Voigt, 89 F.3d 1050, 1087 (3d Cir.), *cert. denied*, 117 S. Ct. 623 (1996); United States v. Swank Corp., 797 F. Supp. 497, 500 (E.D. Va. 1992) (both relying on § 981 cases to interpret § 982 language).

26

(the corpus), any commissions or fees paid to the launderer, and *any property used to facilitate the laundering offense*." <u>United States v. All Monies ($477,048.62) In Account 90-3617-3</u>, 754 F. Supp. 1467, 1473 (D. Hawaii 1991) (citing 134 Cong. Rec. S17365 (daily ed. Nov. 10, 1988) (emphasis added)). Facilitation occurs when the property makes the prohibited conduct "less difficult or more or less free from obstruction or hindrance." <u>United States v. Schifferli</u>, 895 F.2d 987, 990 (4th Cir. 1990) (defining term in context of a drug forfeiture statute that expressly used the "facilitating" language (internal citations omitted)).

Several district courts have upheld the forfeiture of the entire balance of accounts containing both tainted and untainted funds. There, courts have concluded that the commingling of crime proceeds and "clean" money makes money laundering less difficult and may even be necessary to successful completion of the offense. Such untainted funds have therefore been found to be "involved" for purposes of the forfeiture statute. *See* <u>United States v. Contents of Account Numbers 208-06070 and 208-06068-1-2</u>, 847 F. Supp. 329, 335 (S.D.N.Y. 1994); <u>United States v. Certain Accounts, Together with All Monies on Deposit Therein</u>, 795 F. Supp. 391, 396-97 (S.D. Fla. 1992); <u>United States v. Certain Funds on Deposit in Account No. 01-0-71417</u>, 769 F. Supp. 80, 84-85 (E.D.N.Y. 1991). The district court here adopted the facilitation theory and instructed the jury that "property involved" in the money laundering offense included "any property used to facilitate the laundering offense."

Appellants argue that this instruction was incorrect and rely

27

on a Seventh Circuit decision. In <u>United States v. $448,342.85</u>, 969 F.2d 474 (7th Cir. 1992), the court refused to extend § 981's reach beyond "property used in or traceable to" the criminal offense. There, the government sought forfeiture of funds involved in a fraudulent sales scheme that were pooled with allegedly untainted funds and argued that the balances of seized accounts were forfeitable regardless of whether all of the funds were traceable to "specified unlawful activity." <u>Id.</u> at 476. The court rejected this argument and reasoned that simply commingling tainted funds with legitimate funds did not make an entire account subject to forfeiture. <u>Id.</u> at 476. The Seventh Circuit then affirmed the forfeiture of all the funds in the seized accounts because the summary judgment evidence revealed that the criminal proceeds "vastly exceed[ed] the sums on deposit at the time of the seizure." <u>Id.</u> at 477.

We agree with the Seventh Circuit that merely pooling tainted and untainted funds in an account does not, without more, render that account subject to forfeiture. Nevertheless, we do not read <u>$448,382.85</u> as inconsistent with the facilitation theory as applied by many district courts.[6] We find the reasoning of the Southern District of New York persuasive. That court noted:

> [L]imiting the forfeiture of funds under these circumstances to the proceeds of the initial fraudulent activity would effectively undermine the purpose of the forfeiture statute. Criminal activity such as money

---

[6]As the Seventh Circuit acknowledged, "money need not be derived from crime to be 'involved' in it; perhaps a particular sum is used as the bankroll *facilitating* the fraud." <u>$448,382.85</u>, 969 F.2d at 476 (emphasis added).

> laundering largely depends upon the use of legitimate
> monies to advance or facilitate the scheme. It is
> precisely the commingling of tainted funds with
> legitimate money that facilitates the laundering and
> enables it to continue.

Contents of Account Numbers 208-06070 and 208-06068-1-2, 847 F. Supp. at 334-35 (quoting Certain Funds on Deposit in Account No. 01-0-71417, 769 F. Supp. at 84-85). The court held that forfeiture of legitimate and illegitimate funds commingled in accounts was proper as long as the government demonstrated that the defendant had pooled the funds to disguise the nature and source of his scheme. Contents of Account Numbers 208-06070 and 208-06068-1-2, 847 F. Supp. at 335. Other courts have similarly required the government to demonstrate a substantial nexus between the money laundering offense and the legitimate funds. *See* Marine Midland Bank v. United States, No. 93 Civ. 0207, 1993 WL 158542 at * 7-8 (S.D.N.Y. May 11, 1993) (refusing to apply facilitation theory where legitimate funds in account had merely an "incidental or fortuitous" connection to illegal activity), *aff'd in part, remanded in part*, 11 F.3d 1119 (2d Cir. 1993); Certain Accounts with All Monies on Deposit Therein, 795 F. Supp. at 394 (holding that funds derived from legitimate sources are forfeitable if used to effectuate money laundering but refusing to allow forfeiture of funds in indirect accounts where evidence showed only that checks were written against suspect account); *cf.* United States v. Voigt, 89 F.3d 1050, 1087 (3d Cir.) (noting that government must prove that property seized under § 982(a)(1) has "*some* nexus to the property 'involved in' the money laundering offense" (emphasis in

original), *cert. denied*, 117 S. Ct. 623 (1996).

In this case, the money laundering counts arose from six transfers of funds by wire and check from various accounts throughout the country into one account in Tencer's name at California Federal. All of the funds--both legitimate and illegitimate--were quickly moved into the account within a few days in order to conceal the nature and source of the mail fraud proceeds. Faced with such evidence, the jury was entitled to infer that all of the funds in the account were "involved in" the money laundering and subject to forfeiture pursuant to § 982. Because sufficient evidence supports the jury verdict, the district court was bound by the mandatory provisions of § 982 and erred in reducing the forfeiture.[7]

V.

In its judgment, the district court ordered Tencer to pay a combined total of $451,969.60 in restitution to Blue Cross, Mail Handlers, and NALC. Tencer's final contention is that the district court lacked sufficient factual basis for its restitution order. Specifically, Tencer challenges the restitution order's inclusion of claims paid on behalf of Darryl Smith, his wife, and his daughter as to which, he says, there was no evidence of fraud. He further challenges the court's use of the entire amount of claims

---

[7]Tencer also argues that forfeiture of all of the funds violated the Eighth Amendment's Excessive Fines Clause, but he provides no persuasive analysis to support his argument. Given the extensive nature of the criminal activity in this case over a three-year time span and the large sum of money derived from that activity, we conclude that the forfeiture does not represent an excessive fine under the Eighth Amendment.

filed on behalf of patients about whom evidence of fraud was presented; he contends this is excessive because some of these patients testified that they had received minimal treatment.

Restitution, a criminal penalty, is reviewed *de novo*. United States v. Hayes, 32 F.3d 171, 172 (5th Cir. 1994). An order of restitution must be limited to losses caused by the specific conduct underlying the offense of conviction. United States v. Chaney, 964 F.2d 437, 452 (5th Cir. 1992). As established above, we found that the testimony of Jerry Kelley, a coworker of Darryl Smith, sufficiently supported a jury finding that the claim forms submitted in connection with Smith were fraudulent. Moreover, while some patients did testify that they received treatment, no patient testified that the cursory treatment they received was beneficial or designed to improve their health. Given the evidence of rampant fraud and patient testimony that most of the claims submitted on their behalf were completely baseless, we conclude that the district court's restitution award is proper. *Cf.* United States v. Seligsohn, 981 F.2d 1418, 1421 (3d Cir. 1992) (upholding insurance fraud award for fraudulent claims even though some of defendant's claims were legitimate where defendant's own fraudulent conduct prevented victim from distinguishing between legitimate and fraudulent payments).

## VI.

The government cross-appeals on two sentencing issues; specifically, it contends that the district court erred (1) in refusing to enhance appellants' sentence pursuant to the

31

obstruction of justice provision of the federal sentencing guidelines and (2) in determining the "value of funds" laundered in order to set Tencer's base offense level. We review the district court's findings of facts for clear error and its application of the Sentencing Guidelines *de novo*. <u>United States v. Dean</u>, 59 F.3d 1479, 1494 (5th Cir. 1995), *cert. denied*, 116 S. Ct. 794 (1996).

A.

At the appellants' sentencing hearings, the government argued that evidence in the record supported a two-level sentence enhancement under § 3C1.1 of the federal sentencing guidelines.[8] In addition, such an enhancement was recommended by the presentence investigation report. With one exception, the district court, in refusing to allow the obstruction of justice enhancement for both Tencer and Lazar, satisfactorily explained her reasoning. However, the government pointed specifically to trial testimony that after a federal search warrant was executed on the clinic and Tencer's home and a grand jury subpoena was served on Lazar for clinic records, Lazar and another man[9] visited a Carencro storage facility that Lazar had rented earlier under a false name and removed clinic records stored there. According to the storage facility manager,

---

[8]Section 3C1.1, the Sentencing Guidelines' obstruction of justice provision, states:
> If the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels.

U.S. Sentencing Guidelines Manual § 3C1.1 (1995).

[9]There was some dispute at trial as to whether the man accompanying Lazar was Tencer.

32

some of those records were discarded in a dumpster. If the court credited this testimony, we see no apparent reason why the appellants' conduct should not warrant enhancement. We remand this issue for reconsideration by the district court.

B.

We reject the government's contention that the district court improperly calculated the "value of funds" laundered for sentencing purposes. This court reviews the district court's valuation of funds under the money laundering provision of the Sentencing Guidelines for clear error. <u>United States v. Tansley</u>, 986 F.2d 880, 884 (5th Cir. 1993).

Under § 2S1.1 of the guidelines, a defendant's offense level is increased for sentencing purposes according to the value of funds involved. Here, the district court reversed for insufficient evidence counts amounting to roughly $500,000--one-third--of the approximately $1,500,000 commingled funds involved in the original money laundering counts. It then concluded that, for sentencing purposes, it should reduce the value of ill-gotten gains laundered--roughly $452,000--by one-third as well. Based on this reasoning, the court placed a value of $285,000 on the funds laundered. Under this calculation, Tencer was subjected to a two-level increase to his offense level under § 2S1.1(b)(2)(C), rather than the three-level increase warranted under § 2S1.1(b)(2)(D) when the value of funds is more than $350,000. Given the broad discretion accorded to sentencing judges on determining value, we cannot say that the court clearly erred in its determination.

33

## VII.

In sum, we affirm the conviction of both Tencer and Lazar on all counts except counts 2-10; we reverse those counts because the evidence is insufficient to support the conviction. We also affirm the district court's restitution order. However, we vacate the court's forfeiture award, and for reasons stated above, direct the district court to reinstate the jury's forfeiture award related to counts 31-36.

Because of our reversal of counts 2-10 for both defendants, the case must be remanded for resentencing. At resentencing, the district court should also reconsider its refusal to enhance appellants' sentences for obstruction of justice consistent with our discussion of this issue.

Accordingly, the judgment of the district court is AFFIRMED in part; REVERSED in part; and REMANDED for further proceedings consistent with this opinion.