# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 18-50190

UNITED STATES OF AMERICA,

Plaintiff - Appellee

v.

RANDALL VARIAN HANKS,

Defendant - Appellant

United States Court of Appeals
Fifth Circuit

**FILED**

April 3, 2019

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Western District of Texas
USDC No. 7:16-CR-192-1

Before JOLLY, COSTA, and, ENGELHARDT, Circuit Judges.

GREGG COSTA, Circuit Judge:*

Randall Hanks defrauded two employers by convincing them to repeatedly reimburse him for phony electrical jobs. Hanks does not contest that he committed this long and profitable fraud, but now argues that his conviction should be vacated because he did not use the mail in a way that implicates federal jurisdiction. He also contends that the district court erred in sentencing him. We reject both challenges, so affirm.

---

\* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 18-50190

I.

Hanks owned Sandhills Electric, LLC, which did electrical work for oil and gas providers. At the end of 2012, he went to work for Well 2 Web (W2W), a larger company providing similar services. W2W paid Hanks more than just a salary: it also compensated him for the use of Sandhills-owned service trucks and reimbursed him when he used parts remaining from Sandhills's inventory. When Hanks submitted field tickets describing his work and the parts he used at jobs for previous Sandhills customers, W2W paid him promptly. The only problem: Hanks had not done the work. So when W2W mailed invoices to its "customers," they did not pay because they had not received those services. Even more than that, they often did not even have an interest in the land where the services purportedly occurred.

After these invoices went unpaid for many months, W2W took notice. Hanks took steps to diffuse their attention. At one point he told his superiors that two customers had been purchased by a company named Kendler Resources and instructed W2W to send the invoices there. W2W attempted to send Kendler invoices multiple times, but as it turns out, no such company existed. W2W ended Hanks's employment, but not before he made nearly $400,000 from his scheme.

Hanks then managed to secure employment at SCS Technologies. In many ways W2W and SCS are similar—they do similar work and agreed to compensate Hanks similarly. Relying on information Hanks provided, SCS mailed a large number of invoices that went unpaid. Though Hanks again took steps to conceal the deceit—trying to force his technicians to sign for work they had not done and creating elaborate excuses for why invoices were not paid— SCS discovered the scheme within a year. But this time Hanks fared even better, clearing well over a million dollars before he was caught.

2

No. 18-50190

A grand jury indicted Hanks on four counts of mail fraud and three counts of failure to file a tax return. The first two charged mailings are follow-up invoices that his first employer sent to the fictitious Kendler Resources at Hanks's suggestion. The final two are invoices his second employer sent to a customer. At trial, Hanks sought an acquittal on the mail fraud counts, arguing that the federal court did not have jurisdiction. The court denied that request, and the jury convicted him on all counts. The court later sentenced him to concurrent sentences of 97 months in prison for each count of mail fraud and 12 months for each tax count.

## II.

Hanks argues that the charged mailings did not sufficiently relate to his scheme and thus his fraud should have been handled in state rather than federal court. As a jurisdictional issue, we review de novo.[1] *United States v. Traxler*, 764 F.3d 486, 488 (5th Cir. 2014).

Jurisdiction exists under the venerable mail fraud statute when a mailing is used "for the purpose of executing [a] scheme or artifice" that the statute criminalizes. 18 U.S.C. § 1341. Use of the mail does not need to be an essential part of the fraud. *Traxler*, 764 F.3d at 488. It need only "promote the scheme in some manner." *United States v. Hoffman*, 901 F.3d 523, 546 (5th Cir. 2018); *see also United States v. Tencer*, 107 F.3d 1120, 1125 (5th Cir. 1997) (discussing requirement that the mailing must "contribute[] to the execution of the scheme"). But a mere accounting between victims will not cut it; the mailing must "further[] the execution of the fraud." *See Schmuck v. United States*, 489 U.S. 705, 711 (1989).

---

[1] Our court has never answered whether, if facts were contested in connection with the mailing requirement, we owe deference to a jury's finding on that question. We need not reach that issue today either. Hanks did not present any witnesses and does not contest the factual presentation the government makes, only the legal effect of those facts.

3

No. 18-50190

The fraudulent invoices Hanks had his defrauded employers mail the supposed customers furthered the fraud. They made it appear that the services he was billing for were business as usual. By following the normal course of having the company bill the supposed end user for those services, he prevented the immediate detection of his fraud. His employer almost certainly would have asked questions had Hanks sought reimbursement for significant charges that he did not pass on to a customer. So having the invoices sent to "customers" bought Hanks time. His employers would not start to get suspicious until months down the road when they noticed that multiple bills tied to his services were not being paid. Meanwhile, the time the mailings provided allowed Hanks to steal more money. The mailings to the customers thus advanced the scheme by allowing Hanks to defraud his victims of more money. *Cf. id.* at 711–12; *United States v. Mills*, 199 F.3d 184, 189–90 (5th Cir. 1999) (both finding mailings sufficiently tied to the fraud when they helped foster good relations with the victim). That, of course, is the whole point of a fraud.

And it does not matter that Hanks himself did not place the invoices in the mail. It is enough if he caused the mailings. 18 U.S.C. §1341; *Traxler*, 764 F.3d at 488. He did just that by telling his employers he provided services to the purported customers, which resulted in the invoices being sent.

The mailings furthered Hanks's fraud. His crime was a federal one.

### III.

Hanks also challenges his sentence on two grounds. Hanks first argues that the district court clearly erred in calculating his loss amount. He says the $124,000 W2W paid to his wife per his instructions should not have been added to the just over $1.4 million he directly received from the defrauded companies.

4

There is nothing to this complaint. The Presentence Report (PSR) was reliable; it established that Hanks had W2W pay his wife though she did nothing to earn that money. For the dollar amount, the PSR cited a 1099 IRS Form for miscellaneous income that the company generated.[2] Hanks does not meaningfully dispute that his wife's receipt of this money was part of his fraudulent scheme. There was no error, let alone a clear one, in the loss calculation.

The district court also departed upward from the guidelines by finding that Hanks's criminal history category underrepresented a pattern of property offenses. *See* U.S.S.G. § 4A1.3. Such decisions are reviewed for an abuse of discretion. *See United States v. Zuniga-Peralta*, 442 F.3d 345, 347 (5th Cir. 2006). Hanks had convictions for theft and check forgery that were too old to be included in his criminal history calculation, and a pending charge for automobile theft. The district court determined, not unreasonably, that these incidents were similar to the mail fraud that Hanks committed and thus indicated an especially high risk of recidivism. There was no abuse of discretion. What is more, even after making this justifiable upward departure, the district court still gave Hanks a sentence (97 months) that fell within the available range under his original criminal history category (78–97 months).

* * *

The judgment of the district court is AFFIRMED.

---

[2] The PSR said the tax form "revealed Randall Hanks and Christi Hanks received at least $385,034 from SCS…" Hanks seizes on the erroneous reference to SCS—it should be W2W—to argue that the PSR is unreliable. But the context, including a reference to W2W in the very next sentence, show this was just a mistake that does not undermine the reliability of the loss calculation.