In the

# United States Court of Appeals
## For the Seventh Circuit

―――――――――

No. 21-2551

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JANET GUERRERO,

*Defendant,*

APPEAL OF: DANILO TINIMBANG

―――――――――

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:14-cr-00732 — **Rebecca R. Pallmeyer**, *Chief Judge.*

―――――――――

ARGUED APRIL 14, 2022 — DECIDED JUNE 17, 2022

―――――――――

Before SYKES, *Chief Judge*, and HAMILTON and SCUDDER,
*Circuit Judges*.

SCUDDER, *Circuit Judge*. Danilo Tinimbang and his then-
wife Josephine started Donnarich Home Health Care, Inc. in
Lincolnwood, Illinois. His ex-wife allegedly engaged in
healthcare fraud and money laundering conspiracies involv-
ing Donnarich. After Janet Guerrero, one of the alleged co-
conspirators, pled guilty to federal charges, the court ordered

the forfeiture of assets involved with or traceable to the fraud scheme. Tinimbang made a claim to these forfeited assets based on his substantial initial investment in Donnarich. But after careful review the district court entered summary judgment for the government, concluding that Tinimbang had not carried his burden to show a vested or superior interest in the forfeited assets at the time of the underlying criminal acts. We affirm.

# I

## A

Tinimbang founded Donnarich in early 2005 with his then-wife Josephine and their three children, Don Michael, Richard, and Donna. He invested $811,400, became a 50% shareholder, and served as the company's president. At some point in 2006 or 2007, Josephine and others forced him out of his management role, but he maintained his equity position.

In 2005 Josephine and Richard Tinimbang incorporated Josdan Home Health Care, Inc., another home health care company. Thirteen years later, in 2018, Josephine and Richard incorporated a third home health care business, Patient Home Services of Illinois, Inc. At least some of Josdan and Patient Home Services's initial funding came from Donnarich's assets. These developments later prompted Danilo Tinimbang to assert that neither Josephine nor Richard compensated him for the asset transfers from Donnarich to the other home health care companies or for removing him as Donnarich's president.

## B

In 2016 a federal grand jury in the Northern District of Illinois charged Josephine Tinimbang and others—including

Janet Guerrero, an employee of both Donnarich and Josdan—with conspiracy to commit health care fraud (18 U.S.C. § 1349) and conspiracy to launder the proceeds of health care fraud and unlawful payments for patient referrals (18 U.S.C. § 1956(h)). The indictment alleged that between 2008 and 2014 the conspirators used Donnarich and Josdan to bill Medicare for services rendered to purportedly homebound patients, knowing that these patients neither received nor were eligible for such services. The conspirators sought to conceal the proceeds of the fraud between 2008 and 2013, the indictment continued, by creating shell companies and depositing checks in accounts belonging to entities other than those of the intended recipients. The indictment included a notice of the government's intent to seek the forfeiture of assets involved in or traceable to the conspiracies.

Josephine Tinimbang sought to avoid prosecution by fleeing to the Philippines. Guerrero, for her part, pled guilty to the money laundering conspiracy. Pursuant to a plea agreement, Guerrero agreed to forfeit the following assets:

- $1,572,906.88 seized on or about March 5, 2014 from an account held in the name of First USA Finance and Investment at Pershing Advisor Solutions LLC;

- $1,438,050 seized on or about April 24, 2014 resulting from the sale of Facebook shares held in a Computershare account in the name of First USA Finance and Investment;

- Real property in Lincolnwood, Illinois; and

- $425,967.24 in proceeds from the sale of other real property in Lincolnwood.

At Guerrero's sentencing in January 2018, the district court entered a preliminary order of forfeiture or POF, finding that these four assets were "involved in" or "traceable to" property involved in Guerrero's offense conduct.

C

Danilo Tinimbang asserted a timely claim to the POF assets in February 2018. He did so by instituting ancillary proceedings under Federal Rule of Criminal Procedure 32.2(c), contending that he had a legal interest in the POF assets based on his initial investment in Donnarich, his removal as president without compensation, and the allegedly improper transfers from Donnarich to Josdan and Patient Home Services, the two companies formed by his ex-wife Josephine and their son Richard.

Tinimbang did not accompany his claim with any financial tracing to determine whether the POF assets derived from his initial investment in Donnarich. But the government did. During its investigation, the government enlisted the help of a Special Agent at the IRS who "reviewed the movement of funds" between the co-conspirators. This analysis "demonstrate[d] that Donnarich, Josdan, and their associated companies received millions of dollars from Medicare by enrolling non-homebound patients."

The government's analysis also revealed that Guerrero and other conspirators "used shell and 'pass-through' companies closely associated with Josdan and Donnarich . . . to obscure the purpose of certain transactions." These shell companies engaged in several types of transactions—including purchases of stock, real estate, and cashier's checks—to launder the flow of the illicit Medicare proceeds.

With respect to the POF assets specifically identified in Guerrero's plea agreement, the government asserted that it was able to trace the resources used to purchase the assets "to funds that Medicare deposited into several individual and corporate accounts, including accounts for which Guerrero was an authorized signatory." The tracing analysis likewise revealed that the conspirators "engaged in several activities to launder the funds relating to the POF assets."

All told, the government's tracing analysis did not show that any of Danilo Tinimbang's initial investment in Donnarich went towards the purchase the POF assets. It did show, however, that $398,132 of the funds used to purchase the POF assets came from "unspecified sources." The analysis likewise established that approximately 25% of the source of funds of the POF assets was not directly traceable to the underlying Medicare fraud. But the government's analysis more generally showed that POF assets were all involved in the money laundering scheme. For his part, Tinimbang admitted that "he has no basis . . . to specifically dispute any particular portion of the Government's tracing."

Relying upon this record, the district court entered summary judgment for the government. The court recognized the high burden Tinimbang bore in the ancillary proceedings—proving by a preponderance that he held "a vested or superior interest in the POF assets at the time of the criminal acts giving rise to forfeiture." Tinimbang fell short of meeting this burden, the court determined, because he identified no evidence permitting a finding that any of his funds went toward the purchase of any POF asset. From there the district court applied the relation back doctrine—under which title and legal right to forfeitable property "vests in the United States

upon the commission of the act giving rise to forfeiture," 21 U.S.C. § 853(c)—and concluded that title to the POF assets vested in the United States upon the commission of the underlying fraud and money laundering offenses.

The district court underscored that its conclusion did not change even though certain assets could not be specifically traced to the underlying fraud. The court instead determined that "*all* of the funds used to purchase the POF assets were involved in money laundering" and were thus properly forfeitable. The court therefore entered summary judgment for the government.

Tinimbang now appeals.

## II

### A

In sentencing somebody convicted of money laundering under 18 U.S.C. § 1956, the district court "shall order that the person forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property." 18 U.S.C. § 982(a)(1). The forfeiture, in turn, is governed by 21 U.S.C. § 853(c), under which "[a]ll right, title, and interest in property [subject to criminal forfeiture] . . . vests in the United States upon the commission of the act giving rise to forfeiture." 18 U.S.C. § 982(b)(1). After Guerrero pled guilty, the district court implemented these mandates by "determin[ing] what property is subject to forfeiture" and "promptly enter[ing] a preliminary order of forfeiture . . . without regard to any third party's interest in the property." Fed. R. Crim. P. 32.2(b)(1)(A), (b)(2)(A).

In the ancillary proceedings challenging the forfeiture, Tinimbang shouldered the burden of showing by a

preponderance of the evidence that he, as a third party, "has a legal right, title, or interest in the property" and that the forfeiture was invalid because either "the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant *at the time of the commission* of the acts which gave rise to the forfeiture of the property." 21 U.S.C. § 853(n)(6)(A) (emphasis added). This burden is heavy "[b]ecause, by definition, the 'proceeds of an offense do not exist before the offense is committed,' and because 'the government's interest under the relation-back doctrine immediately vests' upon the commission of that offense, any proceeds that ensue from the criminal act belong to the government from the moment that they come into existence." *United States v. Watts*, 786 F.3d 152, 166–67 (2d Cir. 2015) (quoting *United States v. Timley*, 507 F.3d 1125, 1130 (8th Cir. 2007)); see also *United States v. Grossman*, 501 F.3d 846, 848 (7th Cir. 2007) (applying 21 U.S.C. § 853(n)(6) and requiring a claimant to show "that its interest is superior to that of the defendant because it arose before he committed the criminal acts giving rise to the forfeiture").

B

Tinimbang fell short of carrying this statutory burden. To his credit, he candidly acknowledges that he has no basis to dispute any specific component of the government's tracing analysis—a financial assessment that traced the POF assets to proceeds of the Medicare fraud and the money laundering scheme and concluded that there was no "indication that any money once belonging to [Tinimbang] . . . was used to purchase any of these assets." Tinimbang further admits an "inability to directly trace the original source of any particular POF asset back to his original $811,400 contribution to

Donnarich." He thus cannot satisfy the burden Congress imposed on him in § 853(n)(6). See, *e.g.*, *United States v. Catala*, 870 F.3d 6, 10 (1st Cir. 2017) (requiring an interest "in that specific property" subject to forfeiture "*before* the commission of the crime that led to the forfeiture") (emphasis in original).

This relation-back rule operates with great force in cases like this. Recognize the consequence: because the POF assets had origins in the health care fraud and money laundering conspiracies, title vested with the United States upon their purchase. See 18 U.S.C. § 982(a)(1); 21 U.S.C. § 853(c).

That the government's tracing analysis showed that approximately 25% of the funds used to purchase the POF assets were not traceable to the Medicare fraud does not change this result. What the record does show—or so the district court reasonably found—was that *all* funds used to purchase the POF assets were involved in the money laundering conspiracy. Tinimbang cannot challenge this finding by the district court in an ancillary proceeding, which by its terms "does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property." Fed. R. Crim. P. 32.2 advisory committee's note to 2000 adoption; see also *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014) ("By its plain terms, therefore, § 853(n) does not permit 'relitigation' of the district court's antecedent determination that an item of property is subject to forfeiture.").

Even if he could do so, Tinimbang's claim would still fail because "the commingling of crime proceeds with 'clean' money makes money laundering less difficult and may even be necessary to the successful completion of the offense." *United States v. Baker*, 227 F.3d 955, 970 (7th Cir. 2000) (quoting

*United States v. Tencer*, 107 F.3d 1120, 1134 (5th Cir. 1997)). The clean funds, in short, are deemed "involved for purposes of the forfeiture statute." *Id.* (quoting *Tencer*, 107 F.3d at 1134) (cleaned up). Here, it is undisputed that *all* the funds that comprise or were used to purchase the POF assets were involved in the money laundering. Title to the POF assets therefore vested in the United States upon their acquisition, which means Tinimbang never held a legal interest in them. See *Watts*, 786 F.3d at 166–67.

## C

Tinimbang begs to differ by invoking general principles of equity and fairness and arguing that the district court imposed an unreasonable burden by failing to see him as a victim of his wife's fraud and, in turn, requiring him to trace his clean funds to the forfeited assets. But this position is foreclosed by the statutory scheme Congress prescribed, which required Tinimbang to show a superior interest in the POF assets to the government. See 21 U.S.C. § 853(n)(6)(A). The district court applied this precise framework. At the very least, and as recognized by the district court, "no reasonable jury could find that the portion of the POF assets [Tinimbang] seeks is traceable to the wrongdoing he suffered" because he provided no tracing analysis of his own.

Our conclusion does not leave Danilo Tinimbang without an avenue for recourse. All along he could have filed a remission petition with the Attorney General, who Congress has authorized to "grant petitions for mitigation or remission of forfeiture . . . or take any other action to protect the rights of innocent persons which is in the interest of justice." 21 U.S.C. § 853(i)(1); see also 28 C.F.R. § 9.5(a)(1). He could have also pursued a derivative action on behalf of Donnarich itself

against his ex-wife and others in the company for their misuse of corporate assets or conversion. We offer no view on the ultimate merits of such actions or their availability at this date.

*       *       *

Because Tinimbang has not shown he has a legal interest in the forfeited assets, much less one that is superior to the interest held by the government, we AFFIRM the district court's entry of summary judgment in the government's favor.