UNITED STATES of America,

v.

Ibrahim Elsayed HANAFY (8) Mohamed M. Mokbel (10) Samer Samad Quassas (11) Adel Hisham Saadat (13)

No. CRIM.A.3:99–CR–041–L.

United States District Court,
N.D. Texas,
Dallas Division.

Dec. 5, 2000.

---

Paul E. Coggins, Jr., Joseph M. Revesz, Ass't U.S. Atty., Irma C. Ramirez, Ass't U.S. Atty., U.S. Attorney's Office, Dallas, TX, for U.S.

William D. Sims, Jr., Scott Wayne Breedlove, Todd A. Murray, Vinson & Elkins L.L.P., Dallas, TX, for Ibrahim Elsayed Hanafy.

Frank H. Jackson, Dallas, TX, for Mohamed M. Mokbel.

Donald E. Ervin, Houston, TX, for Samer Samad Quassas.

Jerry J. Lofton, Ft. Worth, TX, for Adel Hisham Saadat.

## MEMORANDUM OPINION AND ORDER

LINDSAY, District Judge.

Before the court are Defendant Mokbel's Motion for Judgment of Acquittal and Motion for New Trial, filed August 4, 2000; Defendant Hanafy's Motion for Judgment of Acquittal, filed August 8, 2000; and Defendant Saadat's Motion for Judgment of Acquittal, filed August 16, 2000; collectively, "Defendants' motion."[1] Also before the court are four Motions for Issuance of a Preliminary Order of Forfeiture, one for each Defendant, filed by the Government on September 11, 2000. After careful consideration of the motion, briefs, response, and applicable law, the court **grants in part** and **denies in part** Defendants' motion; and denies the Government's motions. Defendants are **acquitted** of counts 2–99 of the indictment. Defendants' request for a judgment of acquittal on count 1 is **denied,** but their alternative request for a new trial is **granted.** Defendants' conviction on count 1 of the indictment is therefore vacated.

### I. Factual and Procedural Background

This case involves the purchase, repackaging, and sale of infant formula. The alleged scheme, in essence, proceeded as follows. Various unidentified individuals sold individual cans or cases of infant formula, some of which were probably stolen, to a number of different convenience stores in Texas. The convenience stores in turn sold the infant formula to various companies owned by Defendants. Defendants obtained cardboard containers or shipping trays for the formula. The shipping trays, designed to extend upward only a few inches and leave visible most of the containers therein, were deliberately designed to resemble the containers of the manufacturers, including use of the manufacturers' trademarks. Defendants had no authorization from the manufacturers to do this. Defendants then repackaged the original cans of infant formula, by placing them in a "counterfeit" shipping tray and shrink-wrapping the tray and contents, for resale. No evidence was presented that Defendants had removed infant formula from the original *cans* and repackaged that; the repackaging was limited to placing the intact cans in shipping trays. At least one transportation of the formula across state lines was proved, involving a truck shipment from Texas to Louisiana.

The Government contends that at least some of the cans or cases of formulas sold to convenience stores were acquired by the seller illegally, for example, by shoplifting, other thefts, or acquiring the goods through a food stamp or equivalent program with the intent to resell. Defendants claim that their business relied on "the price differential between the sales price of certain massive retailers and the purchase price available to most other wholesalers and retailers," Defendant Hanafy's Motion for Judgment of Acquittal at 2. The profit-

---

1. Defendant Saadat's motion incorporates by reference the other two motions. Defendant Mokbel's motion incorporates by reference the motion by Defendant Hanafy. Defendant Hanafy's motion indicated that he joined in motions filed by other Defendants. No motion has been filed by Defendant Quassas, although Defendant Mokbel's motion may have been intended to encompass all four Defendants. The nature of the arguments by Defendants, however, are such that the court's ruling will necessarily affect all Defendants. In any event, Defendant Quassas, along with the other three Defendants, moved for judgments of acquittal during the course of trial and his counsel participated during oral arguments at the hearing on November 15, 2000. The court therefore construes all of these motions as having been made collectively by all four Defendants, and hereinafter refers to the motions collectively as "Defendants' motion."

ability of the business thus depended, according to Defendants, on a type of arbitrage rather than purchasing stolen goods.

Defendants were tried on a 99 count indictment based on the conduct noted above and related actions. The charges included conspiracy, 18 U.S.C. § 371 (count 1); interstate transportation of stolen goods, 18 U.S.C. § 2314 (count 2); trafficking in goods with counterfeit marks, 18 U.S.C. § 2320 (counts 3–11); selling misbranded good with intent to defraud, 21 U.S.C. §§ 331(a), 333(a)(2) (counts 12 –17); money laundering, 18 U.S.C. § 1956 (counts 18–49); and engaging in monetary transactions with criminally derived property, 18 U.S.C. § 1957 (counts 50–99). On July 14, 2000 the jury, after deliberating for less than three hours, which included a break of twenty minutes, returned guilty verdicts on all counts of the indictment. On July 17, 2000 the jury also assessed cash forfeitures against Defendants,[2] based on the convictions on counts 18–99, pursuant to 18 U.S.C. § 982(a)(1). Defendants now contest the verdicts on all 99 counts, and seek judgments of acquittal pursuant to Fed. R.Crim.P. 29(c) or, in the alternative, a new trial pursuant to Fed.R.Crim.P. 33.

Defendants assert that their conduct does not, as a matter of law, violate 18 U.S.C. § 2320 and 21 U.S.C. §§ 331(a), 333(a)(2). They further assert that the evidence presented at trial is insufficient for counts 1–17. The money laundering and engaging in monetary transactions with criminally derived property counts require an associated unlawful activity as the source of the funds in the transactions. Because the alleged underlying unlawful activity for these counts was the interstate transportation of stolen goods and trafficking in goods with counterfeit marks, Defendants argue that counts 18–99 must fall with those other counts.

**II. Standard of Review**

■ The standard of review for a motion of acquittal is whether, "reviewed in the light most favorable to the Government, drawing all reasonable inferences in support of the verdict," "a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt." *United States v. Pennington,* 20 F.3d 593, 597 (5th Cir.1994). The court does not assess the credibility of the evidence, since "it is the jury's sole province to assess the weight of the evidence and the credibility of the witnesses." *United States v. Molinar–Apodaca,* 889 F.2d 1417, 1423 (5th Cir.1989).

**III. Analysis**

**A. Count 2—Interstate Transportation of Stolen Goods, 18 U.S.C. § 2314**

■ Defendants assert a lack of proof as to this count. Before reviewing the evidence, it is useful to review the requirements of the offense. To convict Defendants of the interstate transportation of stolen goods under 18 U.S.C. § 2314 ("Whoever transports, transmits, or transfers in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud . . ."), the Government must demonstrate "that defendants transported stolen goods in interstate commerce, that defendants knew the goods were stolen, and that the goods were worth more than $5000." *United States v. Anderson,* 174 F.3d 515, 522 (5th Cir.1999); *United States v. Mackay,* 33 F.3d 489, 493 (5th Cir.1994). "Stolen" has a "wide-ranging meaning," including "any dishonest transaction whereby one person obtains that which rightfully belongs to another and deprives the owner of the rights and benefits of ownership." *United States v. McClain,* 545 F.2d 988, 995 (5th

---

**2.** The forfeiture amounts assessed were: Defendant Hanafy, $704,650; Defendant Saadat, $374,000; Defendant Mokbel, $212,850; Defendant Quassas, $73,000.

Cir.1977).[3] "Taken by fraud" also is a broad term, including goods obtained through "false representations, dishonesty, and deceit" as well as "reckless and needless representation even when not made with a deliberate intent to deceive." *United States v. Grainger*, 701 F.2d 308, 311 (4th Cir.1983). After reviewing the evidence, the court concludes that the Government has failed to prove the Defendants transported goods valued in excess of $5,000 that were "stolen, converted or taken by fraud."

The Government, in its response to Defendants' motion, discusses various batches of cans of infant formula. Most of these batches, however, are not directly relevant to this count, as they were either not stolen or not linked to interstate transportation. For example, evidence was presented as to Defendant Quassas' confession to a state theft charge resulting from an undercover police "sting" operation. Evidence was also presented concerning cans (identified by "microdots") that were sold to various grocery stores by a shoplifter who had been apprehended by and was cooperating with law enforcement officers; those cans, however, had been donated, rather than stolen. In any event, both of these batches of cans were, at the time sold to Defendants or their agents, under the control of a law enforcement agent and therefore not actually "stolen."

The Government also note that thefts of infant formula declined drastically after Defendants were served with search warrants. Asserting this decline as evidence that substantial portions of the Defendants' purchases were of stolen formula, however, relies on "an old error of logic: *post hoc, ergo propter hoc.*" See *United States v. Lewis*, 211 F.3d 932, 935 (5th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 259, 148 L.Ed.2d 187 (2000). The fact that the decline in thefts *occurred after* execution of the search warrants does not necessarily mean that the decline in thefts *was caused by* execution of the search warrants. Although the decline in thefts is entitled to some consideration, it falls far short of carrying the day for the Government's case.

The indictment is based on 5,343 cases of infant formula transported by truck from Texas to Louisiana. Of this shipment, 1,705 cases came from Central Texas Wholesale (operated by Defendant Hanafy) and 3,638 cases came from Sarah International (operated by Defendant Mokbel, and at which Defendant Quassas worked). The Government must show that, of these 5,343 cases, a portion worth at least $5,000 was actually stolen.[4] The Government relies on statements by two Government witnesses, Musa Yousef Hamdan and Husam Ali Bakeer.

Hamdan, who operated MBK Mart, purchased infant formula from consumers and sold it to A.G. International (owned by Defendant Saadat), which in turn sold the formula to Central Texas Warehouse,

---

3. State law in Texas differs from the requirements under federal law, and includes in the definition of theft: "Appropriation of property is unlawful if ... property in the custody of any law enforcement agency was explicitly represented by any law enforcement agent to the actor as being stolen and the actor appropriates the property believing it was stolen by another." Tex. Penal Code Ann. § 31.03 (West 1989). A defendant who receives goods which are not actually stolen, but are represented as such, therefore can be convicted of theft under state law, but cannot be convicted of possession of stolen goods or interstate transportation of same under federal law. *See United States v. Monasterski*, 567 F.2d 677, 681 (6th Cir.1977) (possession of stolen

goods); *United States v. Warshawsky*, 818 F.Supp. 181, 183–86 (E.D.Mich.1993) (interstate transportation of stolen goods), *aff'd in part, rev'd in part on other grounds*, 20 F.3d 204 (6th Cir.1994). Generally, the only issue in federal criminal prosecutions as to the "stolen" nature of the goods is the difference "between 'surveillance and observation' (where goods do not lose their stolen status), on the one hand, and 'recovery' (where goods lose their stolen status)." *Id.* at 185–86.

4. At the Government's suggested valuation of $48/case, which Defendants did not dispute, this would equate to 104 cases, or 2% of the total shipment:

which in turn sold infant formula to Sarah International and other buyers. During his testimony, Hamdan estimated that five percent of the infant formula that he purchased was stolen[5] and another thirty-five percent came from "welfare mothers." Bakeer, an employee of Central Texas Warehouse, testified that he determined some portion of the infant formula being purchased was stolen, based on discussions with people selling the formula to Sarah International, discussions with Defendants, and observations at the convenience stores which purchased infant formula from consumers and resold it to Central Texas Warehouse and Sarah International. Bakeer, unlike Hamdan, did not quantify the portion of purchased infant formula he observed that was stolen. The Government asserts that the jury could infer from Bakeer's testimony that *all* cases of infant formula coming from Sarah International were stolen. The court is not persuaded that this would be a reasonable inference from the testimony.

The evidence of the value of stolen goods transported interstate has many deficiencies. For example, the thirty-five percent of his purchases that Hamdan estimated came from welfare mothers was not adequately shown to be "stolen." The jury instructions explained that "food obtained with benefits provided under a government food stamp, coupon or electronic transfer program *for the purpose of resale*" (emphasis added) was taken by fraud and therefore "stolen." Although the Government provided evidence that some of the formula purchased by Defendants had been obtained through a food stamp or similar program, the court is not convinced

that this is sufficient to further infer that the "welfare mothers," *at the time they obtained the formula,*[6] intended to resell it. Thus, only the five percent of his purchases that Hamdan estimated was actually stolen could be used to satisfy the $5,000 value requirement.

The court further notes that several convenience stores sold infant formula to Defendants. The Government relies on an inference that the percentage of stolen infant formula from other sources, and thus the percentage of the formula at Central Texas Warehouse, would be approximately the same as at Hamdan's store. The court concludes, however, that there was insufficient evidence to conclude, *beyond a reasonable doubt,* that the percentage of stolen infant formula would be the same at both Hamdan's store and Central Texas Warehouse as a whole. The Government further relies on an inference that the percentage of stolen infant formula on the truck that crossed state lines also would be comparable to that at Hamdan's store, which is even more problematic. Applying the same percentage to formula at Sarah International, which received infant formula from Central Texas Warehouse, would require one more link in a causal chain built on inadequately supported assumption. Bakeer's testimony, absent any basis for calculating how much of the infant formula that he observed was actually stolen, is of minimal value, if any, in determining whether the $5,000 value requirement was met.

A long chain of impermissible inferences would be required to determine that the $5,000 value requirement has been met.[7]

---

**5.** Defendants characterize Hamdan's testimony as only that five percent of his purchases did not include receipts, and challenge the inference that purchases without receipts were necessarily stolen.

**6.** Absent an intention to resell at the time of the original purchase, the conduct by the "welfare mothers" may constitute a violation of the law, but the goods purchased would not be *"obtained"* by fraud.

**7.** The Government's reliance on an estimated percentage is itself questionable, even without the need to infer that the same percentage applied in other contexts. Normally the Government points to evidence concerning specific goods included in the shipment. *See, e.g., Backun v. United States,* 112 F.2d 635, 638 (4th Cir.1940) (portion "shown to be stolen property" determined based on specific identification of parts of the shipment).

There may also have been confusion on the jury's part resulting from testimony concerning infant formula that was not actually "stolen," and thus not relevant to this count. Although the truck shipment may well have included the required value of stolen goods, the court is not persuaded that a reasonable juror could conclude beyond a reasonable doubt that the shipment in question included at least $5,000 worth of stolen goods. The court therefore **grants** Defendants' motion with respect to Count 2, and Defendants are hereby **acquitted** of this count.

### B. *Counts 3–11—Trafficking in Goods with Counterfeit Marks, 18 U.S.C. § 2320*

Section 2320 applies to one who "intentionally traffics or attempts to traffic in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services." 18 U.S.C. § 2320(a). A counterfeit mark is "a spurious mark (i) that is used in connection with trafficking in goods or services; (ii) that is identical with, or substantially indistinguishable from, a mark registered for those goods or services …; and (iii) the use of which is likely to cause confusion, to cause mistake, or to deceive." *Id.* § 2320(e)(1)(A). "A 'spurious' mark is one that is false or inauthentic." *United States v. Petrosian*, 126 F.3d 1232, 1234 (9th Cir.1997), *cert. denied*, 522 U.S. 1138, 118 S.Ct. 1101, 140 L.Ed.2d 156 (1998).

 Precedent clearly establishes that attaching a *genuine* mark to a *counterfeit* good makes the mark itself counterfeit within the terms of § 2320. *Id.* That, however, is not this case. Defendants are charged with reproducing the marks for the infant formula in question, without the consent of the mark holder, on shipping trays for the genuine products. The Government argues that attaching a unauthorized mark to *genuine* goods also violates this statute. The court is not persuaded by this argument.

The Government has found only one case discussing the application of § 2320 to defendants accused of repacking of infant formula, *United States v. Ghandour*, 1995 WL 699665 (N.D.Ill. Nov.22, 1995). In *Ghandour*, the magistrate judge concluded:

> Because the cartons do not indicate that the product within them has been repacked, they would provide evidence if the Government brings charges of an offense or offenses under 18 U.S.C. § 2320(a) …. The alleged trademark violation here would stem from defendant's use of manufacturers' trademarks on his packing cartons, unaccompanied by a statement to the public disclosing the fact that cans of baby formula within the cartons have been repacked.

*Id.* at *1 & n. 1. The court's comment, however, was mere dicta, as *Ghandour* concerned the return of property seized by the Government—"the Government [had] voluntarily dismissed the criminal complaint." *Id.* at *1. The court therefore attaches little weight to it.

In *Westinghouse Elec. Corp. v. General Circuit Breaker & Elec. Supply, Inc.*, 106 F.3d 894 (9th Cir.1997), *cert. denied*, 522 U.S. 857, 118 S.Ct. 155, 139 L.Ed.2d 101 (1997), the court held that reconditioned Westinghouse circuit breakers became "counterfeit" when an original mark was attached "in such a way as to deceive the public." *Id.* at 899. There is, however, a significant difference between original and reconditioned parts. The Government neither alleges nor establishes that Defendants adulterated the infant formula, or knew of any adulteration by others. The product itself, that is, the actual contents of any of the cans, was not changed in this case. Defendants repacked the cans, not the product.

In addition, *Westinghouse* was a civil case brought under the Lanham Act, rather than a criminal prosecution under § 2320. *Id.* at 897. The Ninth Circuit suggests that the Lanham Act and § 2320

may cover the same conduct.[8] *See Petrosian*, 126 F.3d at 1234 ("The definition of the term 'counterfeit mark' in the Lanham Act is nearly identical to the definition in section 2320, suggesting that Congress intended to criminalize all of the conduct for which an individual may be civilly liable."). The court finds more persuasive the reasoning of the Tenth Circuit, which concluded that a Lanham Act precedent was "of limited value" in a § 2320 case because, among other reasons, "it dealt with civil liability, while [the defendant] was convicted of violating the criminal version of the statute, which we must construe narrowly." *United States v. Giles*, 213 F.3d 1247, 1250 (10th Cir.2000). "[T]he quasi-constitutional rule of lenity, which counsels us to resolve ambiguity in criminal statutes by construing them narrowly," *United States v. Cisneros*, 203 F.3d 333, 342 (5th Cir. 2000), also counsels a narrower construction for § 2320 than for the Lanham Act. *Westinghouse* therefore is of little value in deciding this issue.

The court also notes two recognized exceptions to criminal liability under § 2320. The first is the so-called "gray market" exception, for "trafficking in authentic goods that have been obtained from overseas markets and imported into the United States." S.Rep. No. 98–526, *reprinted in* 1984 U.S.C.C.A.N. 3627, 3637. Although this statement was made in reference to the Senate version of the bill rather than the final compromise legislation, the "gray market" exception was retained. Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31673 (1984) ("The sponsors are also aware of the existence of 'parallel imports' or 'grey matters' goods .... Neither of these types of *goods*

are [sic] counterfeit within the meaning of this legislation.") (emphasis added).[9]

The second exception, the so-called "authorized use" or "overrun" exception, is included in the statute itself. A counterfeit mark "does not include any mark or designation used in connection with goods or services of which the manufacturer or producer was, at the time of the manufacture or production in question authorized to use the mark or designation for the type of goods or services so manufactured or produced, by the holder of the right to use such mark or designation." 18 U.S.C. § 2320(e)(1). This exception appears to be intended to cover situations involving a licensee manufacturer. "If a licensee manufacturer overruns during the course of a valid license, the marks on those goods will remain noncounterfeit for purposes of this act, whatever changes may later occur in the relationship between the trademark owner and the licensee. Thus, if goods are manufactured during the course of a valid license, and sold after the termination of the license, the marks of those goods remain noncounterfeit." Joint Statement on Trademark Counterfeiting Legislation, 130 Cong. Rec. 31676 (1984).

A common denominator of these two exceptions is that the goods to which the mark is attached were manufactured by, or with the permission of, the owner of the mark—that is, the goods themselves are genuine. That Congress saw fit to exempt "gray market" goods and overruns by a licensee (sold beyond the license period) from criminal liability lends support to an interpretation that § 2320 was intended to prevent trafficking in goods that were sim-

---

**8.** Section 2320 itself contains only a limited reference to the Lanham Act: "All defenses, affirmative defenses, and limitations on remedies that would be applicable in an action under the Lanham Act shall be applicable in a prosecution under this section." 18 U.S.C. § 2320(c). That reference is not applicable in this case, where the issue is the elements of the substantive offense rather than defenses.

**9.** This exception provides relevant data in attempting to determine Congress' intent, but does not directly govern this case. Defendants' contention that their "actions fall squarely within the 'gray goods' exception to criminal liability," *see* Defendant Hanafy's Motion for Judgment of Acquittal at 17, is clearly erroneous. No evidence was presented that the goods in question were imported.

ilar to but different than the goods normally associated with the mark.

The court also notes that the most natural reading of the literal language of the statute would exempt the situation in this case.[10] The Government does not dispute that the infant formula was manufactured by the companies that held the corresponding marks. Certainly in that situation, "the holder[s] of the right to use such mark[s]" has authorized "the manufacturer or producer ... to use the mark" for those goods. 18 U.S.C. § 2320(e)(1). As noted above, the Government argues that this "authorized use" exception was intended to apply to licensee manufacturers, but that is not what Congress enacted. A statement by sponsors that this provision *applies* to licensee manufacturers is not the same as a statement that the provision is *limited* to licensee manufacturers. When the language of the statute is clear and unambiguous, and absent a clear indication that the legislative intent was otherwise, "a literal reading of Congress' words is generally the only proper reading." *United States v. Locke*, 471 U.S. 84, 93, 105 S.Ct. 1785, 85 L.Ed.2d 64 (1985).

Further support for this interpretation is offered by the statutory requirement that use of the mark "is likely to cause confusion, to cause mistake, or to deceive." 18 U.S.C. § 2320(e)(1)(A)(iii). The confusion in question most naturally would arise because the mark purports the goods to be one thing and in fact they are something else. "It is essential to the Act's ability to serve this goal that the likely to confuse standard be interpreted to include post-sale confusion. A trademark holder's ability to use its mark to symbolize its reputation is harmed when potential purchasers of its goods see *unauthentic goods* and

identify these goods with the trademark holder." *United States v. Torkington*, 812 F.2d 1347, 1353 (11th Cir.1987) (emphasis added) (quoted approvingly by *United States v. Yamin*, 868 F.2d 130, 133 (5th Cir.1989)).

The Government argues that confusion arises because the shipping trays included the mark but did not indicate that the product had been repacked, thus implying that the product came directly from the manufacturer. This argument derives from several cases which have held repackagers liable for failure to disclose that the product had been repackaged. Such failure to disclose was considered confusing to consumers as to the source of the product. *See, e.g., Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, 1086 (9th Cir.1998) ("Here, Price/Costco does not disclose to the public that it has repackaged Enesco's original product. This may cause confusion by the public as to Price/Costco's role in repackaging the figurines in allegedly inadequate, clear plastic blister packs."); *Bayer Co. v. Shoyer*, 27 F.Supp. 633, 635–36 (E.D.Pa. 1939) (repackager required to "disclose the fact of the rebottling or repackaging, so that the public may know that the product has passed through other hands"). The Government argues that this constitutes a recognized exception to the normal rule that use of a mark with genuine goods cannot be confusing.

The court finds this argument unpersuasive. The cases cited involved actions under the Lanham Act rather than § 2320. Applying these precedents to a prosecution under § 2320 is problematic for two reasons. First, criminal statutes, such as § 2320, generally should be construed more narrowly than statutes imposing civil liability, such as the Lanham Act,[11] *see*

---

10. Section 2320 itself is titled "Trafficking in *counterfeit goods* and services." (emphasis added). This provides further support for an interpretation that attaching an unauthorized mark to genuine goods does not violate § 2320.

11. The court also notes that the two statutes have different "authorized use" exceptions. The Lanham Act only provides liability for use of the mark "without the consent of the registrant." Section 2320 excepts use of the mark when it was authorized "at the time of the manufacture or production," 18 U.S.C. § 2320(e)(1). A defendant who was autho-

*Giles,* 213 F.3d at 1250. The Government conceded at oral arguments that this "repackaging rule" has never been applied to a prosecution under § 2320, despite the fact that the rule is over 75 years old. *See Prestonettes, Inc. v. Coty,* 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731 (1924).

Second, the court notes that the scope of the Lanham Act is broader than that of § 2320. The Lanham Act specifically addresses confusion arising as to the origin of a product, regardless of whether the confusion is caused by use of a mark or by other means. It provides for civil liability for use of "any false designation of *origin,* false or misleading description of fact, or false or misleading representation of fact, which ... is likely to cause confusion, or to cause mistake, or to deceive as to ... *origin,* sponsorship, or approval" of the goods. 15 U.S.C. § 1125(a)(1) (emphasis added). Section 2320 has no equivalent. The "repackaging rule" is directed, in part, at confusion concerning the source of the product, *see, e.g., Enesco Corp.,* 146 F.3d at 1086 ("confusion by the public as to Price/Costco's role in repackaging the figurines"); *Bayer Co.,* 27 F.Supp. at 635–36 ("so that the public may know that the product has passed through other hands"). The broader reach of the Lanham Act therefore provides stronger support for application of the repackaging rule than does the scope of § 2320.[12]

For the above reasons, the court concludes as a matter of law that unauthorized use of a reproduction of a mark in connection with genuine goods (that is, what the mark represents the goods to be) does not violate 18 U.S.C. § 2320. As part of that determination, the court concludes that the repackaging rule of *Prestonettes, Inc. v. Coty,* as applied to actions brought under the Lanham Act, is not applicable to criminal prosecutions under § 2320.[13] The court therefore grants Defendants' motion with respect to Counts 3–11, and Defendants are hereby acquitted of these counts.

**C.** **Counts 12–17—Introducing Misbranded Food Articles into Interstate Commerce with Intent to Defraud, 21 U.S.C. §§ 331(a), 333(a)(2)**

■ The underlying provision, 21 U.S.C. § 331(a), prohibits "[t]he introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded." The Government alleges further that Defendants' conduct was "with the intent to defraud or mislead," 21 U.S.C. § 333(a)(2), which increases the potential criminal penalties. A charge of "misbranding" based on misleading "labeling or advertising" considers not only affirmative representations but also

the extent to which the labeling or advertising fails to reveal facts material in the light of such representations or material with respect to consequences

rized to use the mark when the goods were manufactured, but not at the latter point at which the goods were sold, therefore would violate the Lanham Act but not § 2320. That is not this case, but this difference provides further reason to be wary of applying Lanham Act precedents to a prosecution under § 2320.

**12.** It is not clear whether any confusion on the part of the public in this case arises from "the use of" the mark, 18 U.S.C. § 2320(e)(1)(A)(iii), as opposed to the *absence* of an indication that the shipping trays had been repacked. To some extent, the alleged confusion arises from the combination of both factors. The Government does not claim that

Defendants could be convicted for using plain shipping trays without indicating the trays were repacked. The Government asserts only that Defendants cannot use the marks on the shipping trays *without* indicating that the trays were repacked. It is not clear that even this combination of factors suffices for a violation of § 2320, since the statute requires that confusion arise from the use of the mark. Defendants' conduct is more plausibly violative of the Lanham Act, which is not restricted to confusion arising from the use of the mark itself, than of § 2320.

**13.** Of course, the court does not address any liability that might arise in a civil action under the Lanham Act.

which may result from the use of the article ... under the conditions of use prescribed in the labeling or advertising thereof or under such conditions of use as are customary or usual." 21 U.S.C. § 321(n). "The term 'labeling' means all labels and other written, printed, or graphic matter (1) upon any article or any of its containers or wrappers, or (2) accompanying such article." 21 U.S.C. § 321(m). These counts are based on the same conduct that forms the basis for counts 3–11 for trafficking in goods with counterfeit marks—repacking the infant formula in shipping trays without an indication that it had been repacked.

The analysis of these counts is different from that for the counts based on 18 U.S.C. § 2320. The Federal Food, Drug, and Cosmetic Act[14] clearly covers not only affirmative representations but omissions—here, that the cans of infant formula had been repacked. It also is not limited to misuse of the manufacturers' marks, but extends to all "labeling." A key question thus becomes whether the shipping trays, and indications on them that the formula has been repacked, constitute "labeling." After careful consideration of relevant case law, the court concludes that the shipping trays are not labeling, and thus that Defendants' conduct does not, as a matter of law, violate 21 U.S.C. §§ 331(a), 333(a)(2).

The meaning of "labeling" is not, despite the attempt in 21 U.S.C. § 321(m), entirely clear. In addition to the traditional labels on cans of food (which in this case were undisturbed and therefore presumably not misleading), "labeling" has been held to encompass a number of other categories of items. *See, e.g., United States v. Urbuteit,* 335 U.S. 355, 357–58, 69 S.Ct. 112, 93

L.Ed. 61 (1948) (leaflets explaining the use of "electrical devices allegedly aiding in the diagnosis and cure of various diseases and physical disorders such as cancer, diabetes, tuberculosis, arthritis, and paralysis"); *Kordel v. United States,* 335 U.S. 345, 349–51, 69 S.Ct. 106, 93 L.Ed. 52 (1948) (literature explaining the use of the drugs, even when shipped separately); *United States v. Walton,* 36 F.3d 32, 33–35 (7th Cir.1994) (the "use-before" dates on invoices and packing slips for pacemakers); *United States v. 47 Bottles, More or Less, Jenasol RJ Formula "60,"* 320 F.2d 564, 568 (3d Cir.1963) (leaflets, not physically attached, but explaining "the uses of the royal jelly product and the purported health benefits to be derived from it"); *United States v. 4 Devices, Labeled in Part 'Color–Therm,'* 176 F.2d 652, 654 (10th Cir.1949) (instructions for the use of medical devices,[15] although not attached to the devices); *United States v. Article or Device "Hubbard Electrometer,"* 333 F.Supp. 357, 361 (D.D.C.1971) (books and pamphlets "replete with false medical and scientific claims" concerning a device offered by the Church of Scientology); *United States v. 250 Jars, etc., of U.S. Fancy Pure Honey,* 218 F.Supp. 208, 211–12 (E.D.Mich.1963) (leaflets and booklets which made "the rather remarkable claim that honey is a panacea for various diseases and ailments that have plagued man from time immemorial," as a result of which the court concluded the honey "was intended to be used in the capacity of a drug"), *aff'd,* 344 F.2d 288 (6th Cir.1965); *United States v. 8 Cartons, Containing "Plantation 'The Original,' etc., Molasses,"* 103 F.Supp. 626, 627 (W.D.N.Y.1951) (a book, "Look Younger, Live Longer," displayed near product, which made many health-related claims for the molasses, including that it "will add

---

**14.** 21 U.S.C. § 301 *et seq.*

**15.** The devices consisted of "a wooden cabinet with a series of tubes on top thereof for producing colored lights similar to neon lights, together with electrical connections needed to operate them and an accessory applicator consisting of two tubes, a handle and an extension cord to connect it with the main device. The user is instructed to place his bare feet on the cabinet tubes, elevate his head so that he can see the colors, and to massage with the applicator tubes the area of the body affected." *4 Devices,* 176 F.2d at 653.

five youthful years to an individual's life"; the retailer prominently displayed the book and handed it to prospective purchasers).

A common theme running through these examples is that the "labeling" is intended to provide *substantial* information about the use or benefits of the article. As such, it "constituted an *essential* supplement to the label attached to the package." *Kordel*, 335 U.S. at 348, 69 S.Ct. 106 (emphasis added); *see also Urbuteit*, 335 U.S. at 357, 69 S.Ct. 112 ("This machine bore only the words, U.S. Patent Sinuothermic Trade Mark. It was the leaflets that explained the usefulness of the device in the diagnosis, treatment, and cure of various diseases."). The Government construes that the shipping trays, by using the manufacturers' marks but not indicating that the formula had been repacked, either affirmatively misrepresented that the product was received directly from the manufacturer or failed to disclose the material information that the product had been repacked. The Government also submitted evidence that this distinction, whether or not the product had been repacked, was important to at least some purchasers, and that Defendants were aware of this.

The court, however, is not persuaded that this is sufficient to classify the shipping trays as "labeling." Shipping trays are often removed from products before the immediate container (in this case, a can) is placed on display for consumers. The shipping trays in this case contain virtually no information that is not also displayed on the immediate containers themselves. In fact, the *only* information

that apparently would be gleaned from the shipping trays would be that the product had been repacked. This information is of an entirely different order of magnitude than the "labeling" in the cases cited above.[16] The court concludes, as a matter of law, that 21 U.S.C. §§ 331(a), 333(a)(2) do not encompass a "misleading" indication (through affirmative representations or omissions) on a shipping tray as to whether the intact immediate containers of the product have been repacked into new shipping trays. The court therefore **grants** Defendants' motion with respect to Counts 12–17, and Defendants are hereby **acquitted** of these counts.

### D. Counts 18–99—Money Laundering, 18 U.S.C. § 1956, and Monetary Transactions with Criminally Derived Property, 18 U.S.C. § 1957

■ These provisions concern conduct by those who "knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity with the intent to promote the carrying on of specified unlawful activity," 18 U.S.C. § 1956(a)(1)(A)(i), or "knowingly engages or attempts to engage in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity," 18 U.S.C. § 1957(a). A common denominator for both statutes is that the transaction must involve funds derived from unlawful activity. The underlying

---

**16.** The court also notes that the shipping trays *did* include an indication that the formula had been repacked, although not necessarily evident to the usual customer. Manufacturers pack shipping trays with cans from the same batch number, to facilitate a recall, and include the batch number on the shipping trays. The "counterfeit" shipping trays, which mixed cans from different batch numbers, did not designate a batch number. The alleged misbranding in this case therefore would be misleading to someone who: 1) knew that

products are sometimes repacked by other than the manufacturer; 2) considered this significant in making a decision about whether to purchase the product; 3) was familiar enough with packaging customs to know that repacked products *should* be discernible by a "REPACKED" stamp on the shipping tray *or* an absence of the manufacturer's mark; but 4) was not familiar enough with packaging customs to identify product as repacked because of the absence of a batch number.

"specified unlawful activity" in this case is alleged in the indictment to be the transportation in interstate commerce of stolen goods valued at more than $5,000 (18 U.S.C. § 2314) and/or trafficking in goods with counterfeit marks (18 U.S.C. § 2320).

The Fifth Circuit has held that the money laundering offenses [17] do not require conviction of a specific predicate offense. *United States v. Tencer,* 107 F.3d 1120, 1130–32 (5th Cir.1997).[18] *Tencer* distinguished between money laundering counts: 1) which specifically cross-referenced other counts that were subsequently vacated (in which case the money laundering count would be vacated); and 2) which referenced the unlawful activity in general terms without specifically defining it as the other counts that were subsequently vacated (in which case the money laundering count could stand). *Id.* In this case, the indictment did not restrict the specified unlawful activity to counts 2–11; it merely defined the conduct in general terms, as interstate transportation of stolen goods and trafficking in goods with counterfeit marks. This would fall within the second category of *Tencer* and therefore automatic reversal of the money laundering charges is not applicable.

*Tencer* did, however, indicate that there must be evidence sufficient to show the specified unlawful activity; the evidence need not be restricted to the other counts in the indictment, but there must be such evidence. *Id.* In this case, there was *no* evidence, sufficient to establish the predicate offense, of a key element of the offense of interstate transportation of stolen goods—that is, transportation across state lines.[19] The only evidence offered of interstate transportation was that related to count 2, and as noted above the court concludes that such evidence was insufficient to establish a violation of 18 U.S.C. § 2314. Neither is there sufficient evidence of the second predicate offense, trafficking in goods with counterfeit marks, since as noted above, the court rules as a matter of law that Defendants' conduct does not violate that statute. The *Tencer* requirement therefore has not been satisfied. The court therefore **grants** Defendants' motion with respect to Counts 18–99, and Defendants are hereby **acquitted** of these counts. Because the cash forfeitures assessed against Defendants were based on the convictions on those counts, the forfeitures are hereby **vacated.** The Government's Motions for Issuance of a Preliminary Order of Forfeiture are therefore **denied.**

### E. Count 1—Conspiracy, 18 U.S.C. § 371

"To establish conspiracy under 18 U.S.C. § 371, the government must establish (1) an agreement between two or more persons, (2) to commit a crime against the United States, and (3) an overt act in furtherance of the agreement committed by one of the conspirators." *Tencer,* 107 F.3d at 1132 (internal quotation marks and citation omitted). "Conspiracy may be proved through circumstantial evidence, and the agreement need not be formal or spoken." *Id.* The indictment specifies three objects of the alleged conspiracy— the interstate transportation of stolen goods, trafficking in goods with counterfeit marks, and selling misbranded products with intent to defraud. As discussed above, the court concludes as a matter of law that Defendants' conduct does not violate 18 U.S.C. § 2320 (trafficking in goods with counterfeit marks) and 21 U.S.C. §§ 331(a), 333(a)(2) (selling misbranded products with intend to defraud). Those

---

**17.** The court uses the generic "money laundering" for both offenses.

**18.** Although *Tencer* interpreted 18 U.S.C. § 1956, the offenses are so similar that the court concludes that *Tencer* should be applied to 18 U.S.C. § 1957 as well, with respect to

the proof of a specified unlawful activity required for conviction.

**19.** *See United States v. Vontsteen,* 872 F.2d 626, 630 (5th Cir.1989), *superseded on rehearing on other grounds,* 950 F.2d 1086 (5th Cir.1992).

objects of the conspiracy therefore do not support a conviction under 18 U.S.C. § 371, as the conduct in question is not unlawful. The conspiracy conviction must stand or fall based on the first object of the alleged conspiracy, the interstate transportation of stolen goods.

■ Although, as discussed above, the court concludes that there was insufficient evidence to convict Defendants beyond a reasonable doubt of the *substantive* count of interstate transportation of stolen goods, that would not prevent a conviction on the conspiracy count. Neither is it necessary for a conspiracy conviction, as it is for the substantive count, that the goods in question are actually stolen. *Warshawsky*, 818 F.Supp. at 186–87. After careful consideration of the evidence at trial, the court concludes that there was sufficient evidence for a reasonable juror to conclude beyond a reasonable doubt that Defendants agreed, as part of their business scheme, that they would purchase stolen goods and transport shipments with stolen goods valued in excess of $5,000 over state lines. Defendants clearly agreed to work together, although they contend their agreement only pertained to legal activities. Testimony concerning the purchase of stolen goods, although insufficient to demonstrate $5,000 worth of stolen goods on the specific shipment that was the subject of count 2, could allow a reasonable juror to conclude that Defendants agreed to purchase stolen goods, in order to increase the total volume of their operation. Similarly, testimony as to the customers to whom Defendants sold the repacked infant formula could easily support a conclusion that Defendants intended to transport the stolen infant formula across state lines. The court therefore denies Defendants' motion with respect to a request for a judgment of acquittal on this count.

That determination does not end the analysis. A further problem with this count is that, although the jury *could* have convicted based on the first object of the alleged conspiracy, the court has no way of knowing whether the jury *did* convict based on that object. It is entirely possible (if somewhat improbable) that the jury convicted only on the second and third objects of the conspiracy, which the court now holds were not unlawful under 18 U.S.C. § 2320 and 21 U.S.C. §§ 331(a), 333(a)(2). For example, the jury could have concluded that stolen goods valued in excess of $5,000 were transported across state lines (and therefore convicted Defendants of the substantive count), but that the agreement between Defendants extended only to buying stolen goods and not to the interstate transportation (and therefore would not have convicted Defendants of a conspiracy based solely on the first object). The jury *may* have convicted Defendants only of conspiracy to commit the second and third objects of the conspiracy, which were not criminal offenses.

■ In general, "the proper rule to be applied is that which requires a verdict to be set aside in cases where the verdict is supportable on one ground, but not on another, and it is impossible to tell which ground the jury selected." *Yates v. United States*, 354 U.S. 298, 312, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1957). This rule is, however, limited in cases of multi-object conspiracies to "cases where one of the alleged objects of the conspiracy is *legally defective*. 'Legal error' is not insufficiency of evidence, but 'means a mistake about the law, as opposed to a mistake concerning the weight or factual import of the evidence.'" *United States v. Mann*, 161 F.3d 840, 857 (5th Cir.1998) (emphasis added) (quoting *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 116 L.Ed.2d 371 (1991)), *cert. denied*, 526 U.S. 1117, 119 S.Ct. 1766, 143 L.Ed.2d 796 (1999). "In cases where the evidence of one of the alleged objectives of the conspiracy is *factually insufficient*, the Court in *Griffin* held that the verdict should stand so long as there is sufficient evidence on another alleged object of the conspiracy." *Id.* (emphasis added). Although *Griffin* declined to extend the holding in *Yates*, it did not

overrule it. *Yates* applies, and a conviction on a multi-object conspiracy must be overturned, if one of the objects is legally defective; *Griffin* applies, and the conviction stands, if the unsupported object is factually insufficient.[20]

This distinction between *Griffin* and *Yates* is based on the potential for juror confusion or error and "makes good sense. Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors are well equipped to analyze the evidence." *Griffin,* 502 U.S. at 59, 112 S.Ct. 466. If a jury convicts on a multi-count conspiracy where one of the counts is factually insufficient, the court presumes that the jury recognized the factual insufficiency and therefore must have relied on the other count, for which there was sufficient evidence. If one of the counts was legally defective, however, that presumption no longer holds.

In this case, the second and third objects are legally defective rather than merely factually insufficient. *Yates,* rather than *Griffin,* controls this case. The court cannot presume that the jury recognized that these objects of the conspiracy were legally defective; indeed, they obviously did not, since they also convicted on the corresponding substantive counts. There is at least a possibility that conviction was based solely on the second and third objects of the conspiracy and that the jury would not have convicted of a conspiracy whose sole object was the interstate transportation of stolen goods. Although this is rather unlikely, Defendants are entitled to the benefit of the doubt. The conviction on the conspiracy count therefore cannot stand. The court **grants** Defendants' motion with respect to a request for a new trial on the conspiracy count. Defendants' convictions on this count are hereby **vacated.**

## IV. *Conclusion*

For the above stated reasons, the court concludes that the counts based on trafficking in goods with counterfeit marks and selling misbranded food with intent to defraud are, as a matter of law, legally deficient as the conduct alleged does not constitute a criminal offense. The conduct alleged in the count for interstate transportation of stolen goods is legally sufficient, but the court concludes that the evidence submitted, viewed in the light most favorable to the Government and drawing all reasonable inferences, is factually insufficient to convict Defendants beyond a reasonable doubt. Defendants are therefore entitled to a judgment of acquittal on counts 2–17. Because the money laundering counts are derivative of these counts, the money laundering counts are also deficient as a matter of law, and Defendants are entitled to a judgment of acquittal on counts 18–99. The conduct alleged in the conspiracy count is legally

---

20. If, however, one of the objects of the conspiracy is "both legally defective and factually unsupported by the evidence," and there was "*no* proof at trial" of that object, "there is no possibility that the jury convicted the defendants on the improper charge and ... the [defendants] were therefore not prejudiced by the legal error." *United States v. Wilson,* 116 F.3d 1066, 1080 (5th Cir.1997) (emphasis added), *cert. denied,* 522 U.S. 1053, 118 S.Ct.

704, 139 L.Ed.2d 646 (1998). That is not this case. Evidence was presented at trial of the second and third objects of the conspiracy (trafficking in goods with counterfeit marks and selling misbranded food with intent to defraud) that could well have convinced the jury to convict based on those objects. This exception to an exception is therefore inapplicable.

sufficient, and the court concludes that the evidence submitted was sufficient to convict Defendants beyond a reasonable doubt on conspiracy to commit interstate transportation of stolen goods valued in excess of $5,000. The conviction on the conspiracy count, however, is tainted by the inclusion of two other alleged objects of the conspiracy which the court now holds were not criminal offenses as required by 18 U.S.C. § 371. Although Defendants are not entitled to a judgment of acquittal, they are entitled to a new trial as requested.

The court therefore **grants** Defendants' motion with respect to counts 2–99 and orders that Defendants are **acquitted** of those counts. The court further **vacates** the cash forfeitures assessed against Defendants based on counts 18–99, and **denies** the Government's Motions for Issuance of a Preliminary Order of Forfeiture. The court **denies** Defendants' motion with respect to a judgment of acquittal for count 1, but **grants** Defendants' motion with respect to a new trial for count 1 and **vacates** Defendants' convictions on that count.

Defendants Hanafy, Quassas, and Saadat are currently released on $100,000/10 percent deposit bond, subject to pretrial services supervision. Defendant Mokbel was taken into federal custody following the jury verdict. Based on the determinations above, and pending action by the Government to initiate a new trial or appeal this decision, the court hereby orders that the conditions of release for Defendants Hanafy, Quassas, and Saadat are **continued,** and that Defendant Mokbel be **released** forthwith, subject to the same conditions of release as were in effect before trial.